# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS<br>    *Plaintiff*,<br><br>v.<br><br>Alejandro Mayorkas, in his official capacity as Secretary of the United States Department of Homeland Security; the United States Department of Homeland Security; Ur Mendoza Jaddou, in her official capacity as Director of United States Citizenship and Immigration Services; United States Citizenship and Immigration Services, and Joseph R. Biden, Jr., in his official capacity as President of the United States<br>    *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 6:23-cv-1 |

---

## ORIGINAL COMPLAINT

---

## I.    INTRODUCTION

1.      The Biden Administration seeks to further its open borders policy by enacting a new agency rule that effectively nullifies federal law excluding aliens likely to become public charges. *See* Public Charge Ground of Inadmissibility, 87 Fed. Reg. 55472 ("2022 Rule").

2.      Since 1882, federal immigration law has barred the admission of aliens who are unable to take care of themselves and will become public charges. 8 U.S.C. § 1182(a)(4)(A) ("Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion

of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible.").

3.      In 1996, Congress enacted, on a bipartisan basis, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, commonly known as the "Welfare Reform Act." 8 U.S.C. § 1601 et seq. (Pub. L. 104-193, 110 Stat. 2105). The Welfare Reform Act declared that "[s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes," and "[i]t continues to be the immigration policy of the United States that—(A) aliens within the Nations border not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organization, and (B) the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(1), (2).

4.      The Welfare Reform Act also "required the Executive to consider an itemized list of factors when making public charge determinations, thereby ensuring that the inquiry was searching rather than superficial. Even more significantly, it added a subsection to the public charge provision rendering most family-sponsored applicants automatically inadmissible on public charge grounds unless they obtained an enforceable affidavit of support from a sponsor (usually the family member petitioning for their admission)." *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 243 (7th Cir. 2020) (Barrett, J., dissenting), *cert. dismissed sub nom. Mayorkas v. Cook Cnty., Illinois*, 141 S. Ct. 1292 (2021).

5.      The 2022 Rule ignores these congressional mandates by only considering cash, but not in-kind, government benefits when assessing whether an individual is likely to become a public charge.

6.     Moreover, the 2022 Rule de-fangs the statutory requirement "rendering most family-sponsored applicants automatically inadmissible on public charge grounds unless they obtained an enforceable affidavit of support from a sponsor" by prohibiting a meaningful evaluation of whether the affidavit is true and correct.

7.     The sum of the 2022 Rule's changes are seemingly intended and designed to ensure—and will ensure—that virtually no alien is ever found to be a public charge.

8.     In a previous case about the meaning of "public charge," then-Judge Barrett wrote, "The plaintiffs have worked hard to show that the statutory term 'public charge' is a very narrow one, excluding only those green card applicants likely to be primarily and permanently dependent on public assistance. That argument is belied by the term's historical meaning—but even more importantly, it is belied by the text of the current statute, which was amended in 1996 to increase the bite of the public charge determination." *Cook Cnty.*, 962 F.3d at 234 (Barrett, J., dissenting).

9.     So too, the 2022 Rule illegally narrows the meaning of "public charge" to oblivion, disregarding of the term's historical meaning and violating the statute.

10.     Defendants also ignore the fact that there is already a final rule that was promulgated in 2019 governing the inadmissibility of public charges that has never been repealed through the notice-and-comment process and which Defendants refuse to enforce.

11.     The timing of the 2022 Rule could not be worse. The U.S. is in the midst of an unprecedented border crisis because of Defendants' open border policy.[1] The 2022 Rule will needlessly exacerbate an already difficult situation. Any changes viewed as further easing

---

[1]     *See e.g.,* Adam Powell, *El Paso Mayor declares state of emergency in response to growing migrant crisis*, El Paso Times (Dec. 17, 2022), https://www.elpasotimes.com/story/news/2022/12/18/el-paso-state-of-emergency-migrant-crisis-title-42-immigration/69737710007/.

immigration enforcement or access to public benefits for aliens will only lead to even more illegal immigration.

12.    This Court should preliminarily enjoin (or stay under 5 U.S.C. § 705), declare unlawful, vacate, and permanently enjoin enforcement of the 2022 Rule.

## II.    PARTIES

13.    Plaintiff the State of Texas is the second largest U.S. state in both population and land area. Texas has 1,254 miles of border with Mexico.

14.    Defendant Joseph R. Biden is the U.S. President. He is sued in his official capacity.

15.    Defendant Alejandro Mayorkas is Secretary of the U.S. Department of Homeland Security ("DHS"). He is sued in his official capacity.

16.    Defendant the U.S. Department of Homeland Security is an executive branch agency of the United States.

17.    Defendant Ur Mendoza Jaddou is Director of U.S. Citizenship and Immigration Services ("USCIS"). She is sued in her official capacity.

18.    Defendant the USCIS is an executive branch agency within DHS.

## III.    JURISDICTION AND VENUE

19.    This Court has jurisdiction under 5 U.S.C. §§ 702 and 703; 28 U.S.C. §§ 1331, 1346, and 1361; the United States Constitution; and the Court's equitable powers.

20.    The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706 and 28 U.S.C. §§ 1361, 2201, and 2202.

21.    This District is a proper venue is proper under 28 U.S.C. § 1391(e).

## IV.   FACTUAL BACKGROUND

### A.   Inadmissible Public Charges

22.     The term public charge first appeared in statute in the Immigration Act of 1882, where Congress barred the admission of "any person unable to take care of himself or herself without becoming a public charge." 22 Stat. 213, ch. 376, § 2(1882).

23.     As USCIS explained (until very recently)[2] on its website:

Strong sentiments opposing the immigration of "paupers" developed in the United States well before the advent of federal immigration controls. During the colonial period, several colonies enacted protective measures to prohibit the immigration of individuals who might become public charges. In the nineteenth century, before the existence of a federal agency responsible for overseeing immigration policies, eastern seaboard states such as New York and Massachusetts enacted state laws that restricted the immigration of aliens deemed likely to become dependent on public institutions such as poor houses. These states also charged steamship companies a "head tax" for each foreign passenger they landed in order to defray the cost of caring for, and sometimes removing, indigent immigrants who ended-up in state-funded facilities.

. . .

The general Immigration Act of 1891 completed the federalization of immigration regulation by creating the office of the Superintendent of Immigration and a federal Immigration Service to inspect all arriving aliens. The 1891 law also retained the head-tax provision and the exclusion of "paupers or persons likely to become a public charge." In the Act of March 3, 1903, Congress added "professional beggars" as a class of exclusion. A 1907 law then added additional language that excluded potential immigrants with a "mental or physical defect being of a nature which may affect the ability of such an alien to earn a living." The Immigration Act of 1917 added "vagrants" to the [likely to become a public charge] provision and this version of it remained substantially unchanged when it was incorporated into the 1952 Immigration and Nationality Act. The [Immigration and Nationality Act] left the [likely to become a public charge] policy substantively the same, but added language explicitly emphasizing the discretionary authority of administrative officers in the Department of State and the Immigration Service to determine the definition of ["likely to become a public charge"]. In sum, a version of the [likely to become a public charge] provision has been part of federal immigration policy from its foundations, and it consistently remained one of the most common grounds for immigrant inadmissibility.[3]

---

[2]     USCIS removed this explanation from its website earlier this year.

[3]     https://web.archive.org/web/20220310053615/https://www.uscis.gov/about-us/our-history/history-office-

24.    The current version of the Immigration and Nationality Act (the "INA") states "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A).

25.    In 1996, Congress enacted the Welfare Reform Act, which stated:

- "Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes," and
- "It continues to be the immigration policy of the United States that—(A) aliens within the Nation's border not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organization, and (B) the availability of public benefits not constitute an incentive for immigration to the United States."

8 U.S.C. § 1601(1), (2).

26.    The Welfare Reform Act restricted the federal benefits aliens are able to receive. It broadly defined "public benefits" to include **in-kind benefits**, including "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency" of, or funds appropriated by, federal, state or local governments. 8 U.S.C. §§ 1611(c)(1)(B), 1621(c)(1)(B). It also inserted into the INA language describing an affidavit of support to be executed by a person, usually the family member petitioning for the alien's admission, who sponsored an alien applying for admission to the United States. 110 Stat. 2105 § 423, *codified at* 8 U.S.C. § 1183a.

---

and-library/featured-stories-from-the-uscis-history-office-and-library/public-charge-provisions-of-immigration-law-a-brief-historical-background (Mar. 10, 2022).

27.     Weeks after enacting the Welfare Reform Act, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ("IIRIRA"). One of the sweeping changes that IIRIRA made to the INA was to require, for the first time, that consular officers or the Attorney General consider an itemized list of factors in making the public-charge determination, ensuring that the public-charge inquiry was searching rather than superficial. *See* 8 U.S.C. § 1182(a)(4)(B)(i) ("the consular officer or the Attorney General shall at a minimum consider" the alien's age; health; family status; assets, resources, and financial status; and education and skills).

28.     More significantly, the IIRIRA added a subsection to the INA's public-charge language rendering most family-sponsored applicants automatically inadmissible on public-charge grounds unless they obtained the enforceable affidavit of support that had been added to the INA by the Welfare Reform Act. *Id*. § 1182(a)(4)(C) (family-sponsored alien is inadmissible unless the sponsor executes an "affidavit of support described in [8 U.S.C. § 1183a] with respect to such alien"). In addition to making the affidavit of support mandatory, the IIRIRA significantly expanded what the affidavit was required to include.

29.     The support-affidavit requirement empowers the federal government, as well as state and local governments, to demand reimbursement from the sponsor for any means-tested public benefit received by the sponsored alien. *Id*. § 1183a(b)(1)(A). A "means-tested public benefit" is one available to those whose income falls below a certain level. The reimbursement authority explicitly excludes certain benefits, regardless of whether they are means tested, from the sponsor's reimbursement obligation, thus including by implication every other means-tested benefit. If the sponsor doesn't pay upon request, the government can sue the sponsor. *Id*.

§ 1183a(b)(2). A sponsor who doesn't keep "the Attorney General and the State in which the sponsored alien is currently a resident" apprised of changes in the sponsor's address is subject to a civil penalty—and that penalty is higher if the sponsor knows "that the sponsored alien has received any means-tested public benefits" other than those described in three cross-referenced portions of the Welfare Reform Act. *Id*. § 1183a(d). The affidavit is generally enforceable for ten years or until the sponsored noncitizen is naturalized. *Id*. § 1183a(a)(2).

30.     The Welfare Reform Act and the INA must be read together when determining what Congress meant by a public charge. Their collective support-affidavit requirement evinces Congress's intent "to aggressively protect the public fisc" and "is at odds with the view that [Congress] used the term 'public charge' to refer exclusively to primary and permanent dependence." *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 253 (4th Cir. 2020), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020) (*quoting Cook Cnty.*, 962 F.3d at 246 (Barrett, J., dissenting)).

31.     Nevertheless, after Congress passed the Welfare Reform Act and IIRIRA, the former Immigration and Naturalization Service undertook rulemaking on, and simultaneously issued interim field guidance on, the meaning of the term public charge. The guidance, commonly known as the "Pearson Memo," functionally erased the statutory language requiring federal officials to look at a specific list of factors when determining who constituted a "public charge" and specifying the reimbursements for which an affiant is responsible. It instead defined as a "public charge" a noncitizen who is "*primarily dependent* on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, (May 26, 1999)

(emphasis added); *see also* Proposed Rule: Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676 (May 26, 1999). More, the Pearson Memo explicitly excluded receipt of in-kind benefits—that is, evidence that a person's income was insufficient for self-support—as evidence of being a "public charge." This proposed rule, and therefore the Pearson Memo that it mimicked, were never finally adopted pursuant to the notice-and-comment procedures of the Administrative Procedure Act ("APA").

32.    Public-charge refusals spiked immediately after the enactment of the Reform Acts in 1996; however, the Pearson Memo's redefinition of "public charge" effectively neutered the INA's amended language in 1999, as illustrated here:

Figure 1

**Immigrant Visa Refusals on Public Charge Grounds, 1990-2019**



Sources: U.S. Department of State (2019 via Politico)

33.     Twenty years later, DHS issued a rule following a notice-and-comment period defining "public charge"—and doing so consistent with what Congress intended in the Welfare Reform Act and IIRIRA. *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("2019 Rule").

34.     Under the 2019 Rule's promulgated definition, a "public charge" is any alien (with some exceptions) who receives certain cash and in-kind government benefits for more than "12 months" in the aggregate in a 36-month period. *Id.* at 41,508. The 2019 Rule also explained what age, health, family-status, financial, and education and skills facts DHS would consider in determining whether an applicant would be a public charge:

| HEAVILY WEIGHTED POSITIVE FACTORS | HEAVILY WEIGHTED NEGATIVE FACTORS |
|---|---|
| • Household income, assets, resources, or support of at least 250% of the Federal Poverty Guidelines for the household size | • Lack of current employment or reasonable prospect of future employment |
| • Current employment with an annual income of at least 250% of the Federal Poverty Guidelines for the household size | • Previous receipt of or approval for receipt of 12 months' worth of public benefits in a three-year period |
| • Private health insurance other than subsidized insurance under the Affordable Care Act | • Medical condition that is likely to require extensive treatment or institutionalization or that will interfere with the ability to provide for oneself or attend school, or work |
| | • Lack of insurance and no prospect of obtaining private health insurance or insufficient financial resources to pay for reasonably foreseeable medical costs related to such medical condition |
| | • Prior determination of inadmissibility or deportability on public-charge grounds |

*Id.* at 41,502–04.

35.     The 2019 Rule's implementation was stalled by a slew of lawsuits, one of which eventually resulted in a vacatur by the Northern District of Illinois. *See City & Cnty. of San Francisco*

*v. USCIS*, 992 F.3d 742, 745–47 (9th Cir. 2021) (VanDyke, J., dissenting) (discussing procedural histories of challenges) (*citing Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1010–11 (N.D. Ill. 2020)). The Supreme Court granted certiorari in one of those lawsuits on February 22, 2021. *Dep't of Homeland Sec. v. New York*, 141 S. Ct. 1370 (2021).

36.     On March 9, 2021—just four days after representing that they were continuing to review the 2019 Rule—Defendants announced that they would no longer defend it because they had determined that continuing to do so was not in the public interest nor an efficient use of government resources. U.S. Dep't of Homeland Security, DHS Statement on Litigation Related to the Public Charge Ground of Inadmissibility (Mar. 9, 2021).[4] That same press released announced that, effective immediately, Defendants would resume applying the Pearson Memo. *Id.* Defendants moved to dismiss every pending appeal of an adverse judgment against the 2019 Rule, the result of which was acquiescence in the Northern District of Illinois's vacatur, despite the Supreme Court having already granted certiorari to review the legality of the 2019 Rule, *DHS v. New York*, 141 S. Ct. 1370 (2021), and having stayed two injunctions against its enforcement, *Wolf v. Cook County*, 140 S. Ct. 681 (2020); *DHS v. New York*, 140 S. Ct. 599 (2020), which necessarily suggested "a fair prospect that a majority of the Court will conclude that the decision[s] below w[ere] erroneous." *Conkright v. Frommert*, 556 U.S. 1401, 1402 (2009) (Ginsburg, J., in chambers). Defendants thereby "implemented a plan to instantly terminate the [2019 Rule] with extreme prejudice—ensuring not only that the [2019 Rule] was gone . . . but that it could effectively never, ever be resurrected, even by a future administration." *San Francisco*, 992 F.3d at 743 (VanDyke, J., dissenting).

---

[4]     Available at   https://www.dhs.gov/news/2021/03/09/dhs-statement-litigation-related-public-charge-ground-inadmissibility.

37.    As they acknowledged to the Supreme Court, Defendants' conduct was unprecedented. Tr. of Oral Argt. 73:23, *Ariz. v. City & Cnty. of San Francisco*, No. 20-1775 (U.S.). Indeed, it inverted typical practice, where the Executive asks lower courts to abate litigation regarding administrative actions it no longer supports until it can rescind or otherwise terminate those actions. *See San Francisco*, 992 F.3d at 751 (VanDyke, J., dissenting).[5] Indeed, that is the approach Defendants have used in most cases involving administrative actions they disfavor.[6] Only here did Defendants decide to capitulate rather than provide notice and an opportunity to intervene to potentially interested parties. *Id.* at 750.

38.    Within a week, DHS and USCIS formalized the Secretary's statement with a notice that "simply implement[ed] the district court's vacatur." Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14,221, 14,221 (Mar. 15, 2021) ("Repeal of the 2019 Rule"). Asserting an "immediate need to implement the now-effective final judgment," Defendants claimed that the notice-and-comment process generally required by the APA to rescind a rule that had been promulgated through the notice-and-comment process—a rule such as this one—was "unnecessary, impracticable, and contrary to the public interest." *Id.*

39.    In doing so, Defendants repealed the 2019 Rule without going through the APA's notice-and-comment process, which effectively amounted to an "agency process for formulating, amending, or repealing a rule" that was required to undergo that process. *See* 5 U.S.C. § 551(5). Worse, when those opposed to their unlawful repeal attempted to hold Defendants to the law,

---

[5]    *E.g.,* Mot. to Hold Case in Abeyance at 4–5, *NFIB v. Acosta*, No. 17-10054 (5th Cir. June 2, 2017); Bethany A. Davis Noll & Richard L. Revesz, *Regulation in Transition*, 104 Minn. L. Rev. 1, 2728 & nn. 127–30 (2019) (collecting examples).
[6]    *E.g.*, Mot. to Hold Cases in Abeyance, *Competitive Enter. Inst. v. NHTSA*, No. 20-1145 (D.C. Cir. Feb. 19, 2021); Appellants' Supp. Br., *O.A. v. Biden*, No. 19-5272 (D.C. Cir. Feb. 18, 2021); Joint Mot. to Hold Case in Abeyance, *Pennsylvania v. Rosenfelt*, No. 1:20-cv-01468-CJN (D.D.C. Feb. 3, 2021), ECF 143.

Defendants actively impeded those efforts. As four Justices of the Supreme Court put it, the

Defendants:

> seized upon one of the now-consent judgments against [them]—a final
> judgment vacating the Rule nationwide, issued in a different litigation—and
> leveraged it as a basis to immediately repeal the Rule, without using notice-
> and-comment procedures . . . As part of this tactic of "rulemaking-by-
> collective-acquiescence," [*San Francisco*, 992 F. 3d at 744 (VanDyke, J.,
> dissenting)], the Government successfully opposed efforts by other interested
> parties . . . to intervene in order to carry on the defense of the Rule, including
> possibly before this Court . . . These maneuvers raise a host of important
> questions. The most fundamental is whether the Government's actions, all
> told, comport with the principles of administrative law.

*Ariz. v. City & Cnty. of San Francisco*, 142 S. Ct. 1926, 1928 (2022) (Roberts, C.J., concurring).[7]

## B.   The 2022 Rule's Definition of "Public Charge"

40.     On September 9, 2022, after a notice-and-comment period, Defendants published

the 2022 Rule, to be effective on December 23, 2022. 87 Fed. Reg. 55472.

41.     The definition of "public charge" in the 2022 Rule, like the definition of "public

charge" in the Pearson Memo, ignores Congress's statement of policy in the Welfare Reform Act.

It asserts that Defendants' judgment is superior to the one Congress inscribed into federal law,

propounding that their redefinition of public charge is "a better interpretation of the statute [that]

properly balances the competing policy objectives established by Congress." But these so-called

"competing policy objectives" are not Congressional policies that are at war with each other;

Congress's policy is reflected in more than a century of statutes aimed at ensuring that aliens do

not rely on public benefits. In short, Congress—pursuant to federal statute—does not want aliens

drawn to the United States by the promise of reliance on public benefits at taxpayer expense.

---

[7]   Texas and several other states are currently challenging these maneuvers. *Cook Cnty., Illinois v. Texas,* 37 F.4th 1335 (7th Cir. 2022), *pet. filed* No. 22-234 (Sep. 13, 2022).

42. Defendants' definition of a "public charge" as an alien who is "primarily dependent" on cash public benefits ignores that the alien may still rely heavily on costly public benefits even if not primarily relying on a benefit for income subsistence. Their definition allows many aliens to receive substantial public benefits while evading a finding, or being subject to a determination, that they are in fact, public charges.

43. Congress's express policy is that aliens should avoid reliance on the government for support. 8 U.S.C.A. § 1601. This is not a semantic distinction: Congress wants an alien who relies on government support, regardless of the type and regardless of the use, to be evaluated as a potential public charge. *Id.*; *see also* 8 U.S.C. § 1182(a)(4). Defendants do not. 87 Fed. Reg. 55472.

**C.    The conflict between Defendants' redefinition of "benefits" and the policy laid out in the INA.**

44. The Welfare Reform Act's definition of "public benefits" is deliberately broad. *See* 8 U.S.C. §§ 1611(c)(1)(B), 1621(c)(1)(B) ("any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit").

45. The 2022 Rule, however, considers cash benefits for income-maintenance purposes or long-term institutionalization at government expense as the only situations that could render an alien a public charge. And it limits the former to supplemental social security income; cash assistance under Temporary Assistance for Needy Families (TANF); and other state, local, or tribal cash programs.

46. The Defendants justify this myopia on the grounds that many public-assistance programs that meet particular needs are geared toward those who also have other means of primary

support. But this merely acknowledges that an individual need not be solely dependent upon public-assistance programs to be dependent upon some public assistance program. The INA, however, does not draw this distinction; Congress was explicitly concerned about aliens' relying on government-funded welfare programs, not about their reliance only on income-deriving benefits.

47.    The Welfare Reform Act's definitions of "federal public benefit" and "state or local public benefit" are not limited to cash benefits. 8 U.S.C. §§ 1611(c)(1)(B) (defining federal "public benefits" as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit"), 1621(c)(1)(B) (same definition for state and local public benefits). Indeed, there is no functional economic difference between a cash benefit and an in-kind benefit such as Medicaid. For example, a recipient of federal or state housing assistance is significantly reliant on the government, as are recipients of Medicaid or other state low- or no-cost medical benefits. Defendants simply ignore that this is the case in favor of their preferred redefinition.

**D.     Government benefits cost money even when they are not a sole means of support.**

48.    Defendants' redefinition also wholly ignores state costs, such as the billions of dollars Texas spends to provide Medicaid benefits to low-income individuals. Indeed, in 2019, the average beneficiary cost Texas's Medicaid program more than $9,000. Medicaid.gov, Medicaid Per Capita Expenditures, https://tinyurl.com/heayt2 (last visited Dec. 21, 2022) (average benefit of $9,084 per capita). And Texas must fund a substantial portion of that cost for each individual recipient. Under the 2022 Rule, these and other costs associated with in-kind benefits would not be considered in a public-charge determination.

49.     The 2022 Rule's narrow and flawed definition of public benefit is inconsistent with Congress's intent and with the way states and the federal government distribute monies for public benefits. While a *de minimis* exception to certain benefits programs may be appropriate, it is not appropriate to exclude entire programs such as Medicaid that cost Texas billions of dollars per year. "The ordinary meaning of 'public charge'" is "one who produces a money charge upon, or an expense to, the public for support and care." *Casa de Md., Inc.*, 971 F.3d at 242. The Welfare Reform Act defines health benefits provided by the federal government and States, like Medicaid, as "federal public benefits" and "state or local public benefits," and they should be considered in the calculation of whether an alien is likely to become a public charge.

**E.   The flaws in the 2022 Rule's evaluation of public-charge status.**

50.     In determining whether an alien is a public charge, Defendants' 2022 Rule focuses only on the statutorily enumerated minimum requirements and the affidavit of support. While adjudicators must use a totality-of-the-circumstances standard, as required by law, the 2022 Rule has significant and unexplained flaws.

51.     The 2019 Rule set standards, and required applicants to provide evidence, concerning how to address the statutory public charge factors and made clear how those factors should be weighed in adjudication. Defendants claim that having these standards is too complex. 87 Fed. Reg. 55,472 ("DHS agrees with the commenters who stated that the 2019 Final Rule was too burdensome on applicants by requiring additional information collection and evidence and its complex requirements."). This fails to meet the requirements of reasoned decisionmaking under the APA.

52.     In particular, Defendants fail to recognize that the 2019 Rule instructed officers how to conduct adjudications instead of providing nothing more than a list of factors absent additional guidance. *See id.* at 55,472 (Defendants stating that they "may periodically issue guidance that will help officers determine how the different factors may affect the likelihood that a noncitizen will become a public charge at any time, including an empirical analysis of the best available data, as appropriate.").

53.     The 2022 Rule also differs from the 2019 Rule in how the affidavits of support are evaluated, with the 2022 Rule simply stating that it will be favorably considered in making a public charge inadmissibility determination. 87 Fed. Reg. 55,472. Conversely, the 2019 Rule stated that DHS would "consider the likelihood that the sponsor would actually provide the statutorily-required amount of financial support to the alien, and any other related considerations." 84 Fed. Reg. 41,292. The 2019 Rule also required USCIS to consider the following evidence: "(1) The sponsor's annual income, assets, and resources; (2) The sponsor's relationship to the applicant, including but not limited to whether the sponsor lives with the alien; and (3) Whether the sponsor has submitted an affidavit of support with respect to other individuals." *Id.*

54.     Defendants now believe that the affidavit evaluation provided for in the 2019 Rule is unnecessary. In making this determination, Defendants note that the affidavit of support is an enforceable contract and enforced by other agencies. 87 Fed. Reg. 55,472. And that, allegedly, a separate DHS evaluation of the affidavit occurs to determine whether fraud, material concealment, or misrepresentation occurred. *Id.* at 55,472. This is, obviously, an insufficient justification to instruct officers not to make an independent determination regarding such affidavits and how the

information contained therein should be used in the evaluation of who is likely to become a public charge.

55. Perhaps most fundamentally, due to its acceptance of the validity of the Repeal of the 2019 Rule, the 2022 Rule failed to understand that it was changing position from the baseline of the 2019 Rule. "The requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

**F.      The 2022 Rule refuses to account for burdens on the States and taxpayers at the federal, State, and local levels.**

56. The 2022 Rule's economic analysis purports to consider the cost it imposes. This analysis is deficient, as it fails to consider the actual administrative burdens placed on each State—parties affected by this 2022 Rule—which pay for most of the public benefits considered in this analysis. Instead, the analysis often focuses on the "chilling effect" of defining "public charge" in line with Congress's wishes, spending its concern on the impact on aliens of disenrollment (or foregone enrollment) rather than the impact on governments and the public at large of its refusal to conform to statutorily enacted policy.

57. Yet Defendants' 2022 Rule analysis posits that disenrollment or forgoing enrollment has downstream economic impacts that, largely due to fewer transfer payments, will *negatively* affect the economy. Yet, Defendants readily acknowledge that they are unable to "quantify the State portion of the transfer payment due to a lack of data related to State-level administration of these public benefit programs." 87 Fed. Reg. 55,472. This is disingenuous—each State makes its budget, including its welfare spending, available to the public, and, even if that were

not the case, the analysis gives no indication that Defendants ever sought the relevant information from the States. And further, it belies that Defendants are even attempting to conform themselves to the INA, which discourages aliens' participation in the very public-spending programs that Defendants claim to be unable to analyze.

58.     More fundamentally, Defendants' delegated role in enforcing the INA is *not* to maximize aliens' access to public benefits or minimize potential diminutions in economic output. *See* 8 U.S.C. § 1601(3) (Congress stating as a *negative* that "[d]espite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates."). Defendants' role is, instead, to enforce the INA as Congress wrote it, including the INA's prohibitions on denying admission to public charges. Indeed, Congress made clear that federal immigration policy is that "the availability of public benefits not constitute an incentive for immigration to the United States," 8 U.S.C. § 1601(2)(B)—the exact opposite of the Defendants' dithering over aliens' potential non-enrollment in public-benefit programs.

59.     "[B]ecause agency action must be based on non-arbitrary, relevant factors, the agency's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (cleaned up). The rationale for agency action reflected in the 2022 Rule contradicts those purposes.

60.     One natural consequence of Defendants' characterization of reduced welfare payments as a negative for aliens is their refusal to analyze that reduction as a positive for governments, and therefore their taxpaying citizens. Texas, for example, spends millions of dollars

per year administering its public-benefits system, which spends billions of dollars per year on services for individuals in the State. Reductions in these payments resulting from enforcement of the INA as it is written would reduce spending on both these benefits and their administration. *See* 84 Fed. Reg. 41,292 (2019 Rule estimating that it would save the States "about $1.01 billion annually."); *see also* 87 Fed. Reg. 55,630 (new estimate in the 2022 Rule that the 2019 Rule would actually result in a reduction of State annual transfer payments "by approximately $1.67 billion due to the disenrollment or forgone enrollment of foreign-born noncitizens and their households from Medicaid"). Defendants did not even try to analyze those impacts under their rule as a positive for state governments and taxpayers. Defendants' failure to undertake that analysis, and their failure to even try to explain why it was unnecessary, was deliberate ignorance of one of the considerations they purported as motivation for their 2022 Rule. That willful blindness is caprice not permitted under the APA.

**G.   The 2022 Rule's effect on Texas.**

61.    Texas's interests are directly affected by the 2022 Rule. In particular, Texas has important interests in conserving its Medicaid and related social-welfare budgets.

62.    Medicaid is jointly financed by the federal government and the States. *Id.* at 4. In 2020, over 4 million Texans relied on Medicaid. Tex. Health & Human Servs. Comm'n, *Texas Medicaid and Chip in Perspective 2* (13th ed. 2020), https://tinyurl.com/y4bhjfyv. That same year, Medicaid funds represented approximately 28% of Texas's budget. *Kaiser Family Foundation, Medicaid Expenditures as a Percent of Total State Expenditures by Fund*, https://tinyurl.com/czpjys9v (last visited Dec. 19, 2022). Although the exact amount of Texas's Medicaid budget spent on aliens who would otherwise be inadmissible under the 2022 Rule has varied, the total budget is always

measured in billions of dollars. *Id.* (total Texas-financed expenditures for Medicaid represented approximately $30.8 billion).

63.     While these programs all come at a large cost to the State and its taxpayers, almost none of the State's Medicaid or other social welfare costs would, under the 2022 Rule, be considered as a part of public charge analysis, even though they are defined as "federal public benefits" and "state or local public benefits" in the Welfare Reform Act.

64.     Texas' budgetary considerations are important reliance interests on the 2019 Rule were impacted by its unlawful repeal and the adoption of the 2022 Rule.

## V.  Claims for Relief

65.     To the extent Texas's claims for relief are or may be inconsistent, it pleads them in the alternative.

### COUNT 1:

### THE ADOPTION OF THE 2022 RULE AND THE REPEAL OF THE 2019 RULE EXCEED STATUTORY AUTHORITY AND ARE NOT IN ACCORDANCE WITH LAW

66.     The APA prohibits agency action that is "in excess of statutory jurisdiction, authority or limitations, or short of statutory right" or is "not in accordance with law[.] 5 U.S.C. § 706(2)(A), (C).

67.     Defendants may exercise only the authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

68.     Defendants' definition of a public charge in the 2022 Rule, as discussed above, is not in accordance with law, and they have no authority or right to redefine terms that Congress has undertaken to define by statute.

69.     Because the 2022 Rule exceeds Defendants' statutory jurisdiction, authority, and limitations; falls short of providing the rights the relevant statutes provide; and is not in accordance with law, its adoption violates the APA.

## COUNT 2:

### THE ADOPTION OF THE 2022 RULE AND THE REPEAL OF THE 2019 RULE WERE ARBITRARY AND CAPRICIOUS AGENCY ACTIONS

70.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A).

71.     Defendants' 2022 Rule, as discussed above, violates 5 U.S.C. § 706(2)(A).

72.     The 2022 Rule is also arbitrary and capricious because Defendants fail to reasonably justify its significant departures from the 2019 Rule. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 30, 42 (1983) (when an agency substantially alters a position, it must "supply a reasoned analysis for the change," and may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

73.     The 2022 Rule is also arbitrary and capricious because it does not take into account the important state interests impacted.

74.     Defendants' Repeal of the 2019 Rule, without adequate explanation, assessment, or notice and comment, was similarly arbitrary and capricious.

75.     Defendants' actions are thus arbitrary and capricious under 5 U.S.C. § 706.

**COUNT 3:**

**THE ADOPTION OF THE 2022 RULE AND THE REPEAL OF THE 2019 RULE
WERE WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW**

76.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "without observance of procedures required by law." 5 U.S.C. § 706(2)(A), (D).

77.     Defendants' 2022 Rule, as discussed above, violates 5 U.S.C. § 706(2)(A), (D).

78.     Defendants' Repeal of the 2019 Rule also violated the APA by not complying with the notice-and-comment requirements of the APA.

79.     Defendants' actions are thus neither in accordance with law nor taken with observance of procedures required by law.

## VI. Demand for Relief

Plaintiff State of Texas respectfully requests that the Court:

1.      Hold unlawful and set aside the 2022 Rule;

2.      Issue declaratory relief declaring the Defendants' actions unlawful;

3.      Issue permanent injunctive relief enjoining Defendants from enforcing the 2022 Rule;

4.      Award such other relief as the Court deems equitable and just.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

AARON F. REITZ
Deputy Attorney General for Legal Strategy

CHRISTOPHER D. HILTON
Chief for General Litigation Division

*/s/Johnathan Stone*
JOHNATHAN STONE
*Attorney-in-Charge*
Assistant Attorney General
Texas State Bar No. 24071779
Southern Dist. Bar No. 1635446
Johnathan.Stone@oag.texas.gov

CHARLES K. ELDRED
Special Counsel for Legal Strategy
Texas State Bar No. 00793681
Southern Dist. Bar No. 20772
Charles.Eldred@oag.texas.gov

RYAN D. WALTERS
Special Counsel
Texas State Bar No. 24105085
Southern District Bar No. 3369185
Ryan.Walters@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4196
Facsimile: (512) 320-0667

*ATTORNEYS FOR PLAINTIFF STATE OF TEXAS*