UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| **STATE OF TEXAS,**  *Plaintiff*,  v.  **ALEJANDRO MAYORKAS,** *et al.*,  *Defendants*. | Case No. 6:23-cv-00001  Hon. Drew B. Tipton |

**IMMIGRATION REFORM LAW INSTITUTE'S BRIEF OF AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................................... 6

**ARGUMENT** ............................................................................................................................ 8

    **I.**    Texas has standing. ........................................................................................................ 8

        A.    States receive special solicitude for standing. ..................................................... 8

        B.    Texas's injury is caused by Defendants. ........................................................... 10

        C.    Texas's claims are redressable by this Court. .................................................. 12

**CONCLUSION** ..................................................................................................................... 16

# **TABLE OF AUTHORITIES**

**Cases**

*Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592 (1982) .......................................................... 7

*Arizona v. United States*, 567 U.S. 387 (2012) ............................................................................... 7

*Ctr. for Inquiry, Inc. v. Warren*, 845 F. App'x 325 (5th Cir. 2021) .............................................. 10

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) .................................................................... 8

*FDIC v. Meyer*, 510 U.S. 471 (1994) ............................................................................................ 13

*Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189 (5th Cir. 2012) ............................... 10

*Lewis v. Thompson*, 252 F.3d 567 (2d Cir. 2001) ......................................................................... 12

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)............................................................................... 8

*Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ................................................................ 6, 8, 10

*State v. Biden*, 10 F.4th 538 (5th Cir. 2021) ............................................................................ 6, 10

*Sullivan v. Stroop*, 496 U.S. 478 (1990) ....................................................................................... 13

*Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018) ....................................................... 7

*Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ................................................................. 6, 7

*Texas v. United States*, 524 F. Supp. 3d 598 (S.D. Tex. 2021) ................................................... 8, 9

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). ................................................................... 7

*Utah v. Evans*, 536 U.S. 452 (2002) ............................................................................................. 10

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) .............................. 6

**Statutes**

1903 Amendments, 32 Stat. 1213 .................................................................................................... 5

8 U.S.C. § 1601 .............................................................................................................................. 12

8 U.S.C. § 1611(b)(1) .................................................................................................................... 12

8 U.S.C. § 1611(c)(1) ............................................................................................................. 12

8 U.S.C. § 1621(c)(1)(B) ......................................................................................................... 9

8 U.S.C. § 1631(a) ................................................................................................................. 12

8 U.S.C. § 1631(c) ................................................................................................................. 12

8 U.S.C. § 1631(f) .................................................................................................................. 13

8 U.S.C. § 1611(c)(1)(B) ......................................................................................................... 9

Act of Feb. 5, 1917, 39 Stat. 874 ............................................................................................ 5

Act of Mar. 3, 1891, 26 Stat. 1084 .......................................................................................... 5

Act of March 3, 1875, 18 Stat. 477 ......................................................................................... 4

Former INA § 212(a)(7), (8), and (15) ................................................................................... 5

Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. 104-108 (Sept. 30, 1996)
 .............................................................................................................................................. 5

Immigration Act of 1882, 22 Stat. 214 (Aug. 3, 1882) ........................................................... 4

Personal Responsibility and Work Opportunity Act of 1996, Pub. L. 104-193 ..................... 5

**Other Authorities**

5 Gordon *et al.*, *Immigration Law and Procedure*, § 63.05[2] (Rel. 164 2018) ............................ 4

H.R. Rep. No. 104-828 (1996) ................................................................................................ 5

JAMES R. EDWARDS, JR., PUBLIC CHARGE DOCTRINE: A FUNDAMENTAL PRINCIPLE OF AMERICAN
   IMMIGRATION POLICY 2 (Center for Immigration Studies 2001) ................................... 4

**Regulations**

*Field Guidance on Deportability and Inadmissibility Public Charge Grounds*, 64 Fed. Reg.
   28689 (1999) ................................................................................................................ 11, 12

*Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28676 (1999) ........ 11

Inadmissibility on Public Charge Grounds; Interpretation of Vacatur, 86 Fed. Reg. 14,221, 14,221 (Mar. 15, 2021) ................................................................................................ 10

**INTRODUCTION**

The exclusion from this country of aliens likely to become public charges predates the first federal immigration statutes. *See* 5 Gordon *et al.*, *Immigration Law and Procedure*, § 63.05[2] (Rel. 164 2018) ("Strong sentiments opposing the immigration of paupers developed in this country long before the advent of federal immigration controls."). Indeed, the exclusion of public charge aliens has been a consistent policy since before the founding of the United States. "American colonists were especially reluctant to extend a welcome to impoverished foreigners[.] Many colonies protected themselves against public charges through such measures as mandatory reporting of ship passengers, immigrant screening and exclusion upon arrival of designated 'undesirables,' and requiring bonds for potential public charges." JAMES R. EDWARDS, JR., PUBLIC CHARGE DOCTRINE: A FUNDAMENTAL PRINCIPLE OF AMERICAN IMMIGRATION POLICY 2 (Center for Immigration Studies 2001) (citing E.P. HUTCHINSON, LEGISLATIVE HISTORY OF AMERICAN IMMIGRATION POLICY, 1798-1965 (Univ. of Penn. Press, 1981)), *available at* https://cis.org/sites/cis.org/files/articles/2001/back701.pdf. Approximately two hundred years later, reliance on public support became the main ground of the very first federal statutory immigration exclusion. *See* Act of March 3, 1875, 18 Stat. 477 (Page Act) (excluding convicts and sex workers thought likely to become dependent on the public coffers for support).

Indeed, immigration statutes have used the term "public charge" for more than 140 years. The first comprehensive federal immigration law included a prohibition against admission of "any person unable to take care of himself or herself without becoming a public charge." Immigration Act of 1882, 22 Stat. 214 (Aug. 3, 1882). This exclusion was continued and expanded by Congress

in subsequent legislation.[1] Congress passed the Personal Responsibility and Work Opportunity Act of 1996 ("PRWORA"), Pub. L. 104-193 to address public discontent over aliens' increasing use of public benefits and welfare programs. Congress also passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104-108 (Sept. 30, 1996), which codified the minimum factors to be considered when making public charge determinations. The legislative history of IIRIRA explains that these amendments were designed to expand the scope of the public charge ground of inadmissibility. H.R. Rep. No. 104-828 (1996) (stating that authority delegated to States in this context "is to encourage States to implement the national immigration policy of assuring that aliens be self-reliant and not become public charges[, which has been] a fundamental part of U.S. immigration policy since 1882.").

In 1999, the Immigration and Naturalization Service ("INS") proposed but never finalized a relaxed interpretation of the INA's public charge rule (the "NPRM"). Although the NPRM never resulted in the adoption of a final rule, a field guidance document (the "Field Guidance") was issued by INS and relied on by immigration officials until an updated rule was issued by the Trump administration in 2019 (the "2019 Rule"). In 2021, the Biden administration decided to stop defending the 2019 Rule from legal challenges and resumed applying the Field Guidance. Complaint, ECF No. 1 ⁋ 36. The Biden administration subsequently published a new public charge rule (the "2022 Rule"), which Plaintiffs challenge in this case.

IRLI agrees with Plaintiffs' arguments in their opposition to Defendants' motion to dismiss, and adds the following arguments regarding standing.

---

[1] Act of Mar. 3, 1891, 26 Stat. 1084 (excluding "paupers"); 1903 Amendments, 32 Stat. 1213 (excluding "professional beggars"); Act of Feb. 5, 1917, 39 Stat. 874 (excluding "vagrants"); Former INA §§ 212(a)(7), (8), and (15) (excluding aliens who were "likely to become a public charge"; were "paupers, professional beggars, [or] vagrants"; or suffered from a disease or condition that impacted their ability to earn a living).

7

## ARGUMENT

**I.     Texas has standing.**

This Court should deny Defendants' motion because Texas has plausibly pled a cognizable injury that this Court can redress. As the Supreme Court has explained, there are "three requirements in order to establish Article III standing. First, [plaintiffs] must demonstrate injury in fact . . . . Second, [plainitffs] must establish causation . . . . And third, [plainitffs] must demonstrate redressability . . . . These requirements together constitute the 'irreducible constitutional minimum of standing[.]" *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (internal quotation marks and citations omitted). Here, Texas satisfies these requirements because the injury it suffers is directly caused by Defendants' action and can be redressed by this Court.

**A.    States receive special solicitude for standing.**

As explained by the Fifth Circuit,

> 'States are not normal litigants for the purposes of invoking federal jurisdiction' and may be 'entitled to special solicitude.' When special solicitude is appropriate, a state can establish standing 'without meeting all the normal standards for redressability and immediacy.' Standing will exist 'if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'

*Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007)). *See also State v. Biden*, 10 F.4th 538, 549 (5th Cir. 2021) ("To eliminate any doubts as to standing, we emphasize that the States are entitled to special solicitude in the standing analysis."). "Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022).

"In enacting the APA, Congress intended for those suffering legal wrong because of agency action to have judicial recourse and the states fall well within that definition." *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015). Here, Texas challenges Defendants repeal of the 2019 Rule and adoption of the 2022 Rule. Thus, "Texas satisfies the first requirement" because "Texas asserts a procedural right under the APA to challenge agency action." *Id*.; Compl. ECF No. 1 at 21-23.

Texas also satisfies the second requirement for special solicitude. Quasi-sovereign interests "are not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party. They consist of a set of interests that the State has in the well-being of its populace." *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 602 (1982). "An agency action may affect a quasi-sovereign interest if it is alleged to damage certain sovereign prerogatives [that] are now lodged in the Federal Government." *Texas v. United States*, 50 F.4th 498, 515 (5th Cir. 2022). Immigration has been recognized as one such interest because "[w]hen the states joined the union, they surrendered some of their sovereign prerogatives over immigration." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015). *See also Arizona v. United States*, 567 U.S. 387, 401-02 (2012) ("Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders."). Therefore, "[t]he importance of immigration policy and its consequences to Texas, coupled with the restraints on Texas' power to make it, create a quasi-sovereign interest." *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022). As this Court has explained, because "the States rely on the federal government to protect their interests, and Congress has provided them a procedural vehicle—the APA—to do so . . . . the Plaintiff States have shown that Texas is entitled to special solicitude in this Court's standing analysis." *Texas v. United States*, 328 F. Supp. 3d 662, 694 (S.D. Tex. 2018).

9

Finally, as this Court has explained, Texas is not required to show "that it is being pressured to change state law[,]" because "the pressure exerted on Texas to reconfigure its budget" to increase government support for aliens who would otherwise be inadmissible public charges threatens a "potential . . . harm [that] is direct and substantial." *Texas v. United States*, 524 F. Supp. 3d 598, 629-30 (S.D. Tex. 2021). The sheer number of aliens entering the country on a daily basis, many of whom are incentivized to come here by relaxed public charge rules, ensures that Texas will incur an increased financial burden to provide services to aliens who should be inadmissible under the INA.

### B. Texas's injury is caused by Defendants.

Traceability requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, not the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). *See also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct") (citation omitted). Because the "States are not normal litigants for the purposes of invoking federal jurisdiction," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), they are "afforded 'special solicitude' in satisfying [their] burden to demonstrate the traceability and redressability elements of the traditional standing inquiry whenever its claims and injury meet certain criteria." *Texas v. United States*, 524 F. Supp. 3d 598, 618 (S.D. Tex. 2021). Indeed, as this Court explained in Texas's challenge to the Biden administration's 100-day pause on removals, "[i]f Massachusetts, armed with special solicitude, can establish causation between the EPA's decision to not regulate greenhouse gas emissions from new motor vehicles and its interest in protecting its

physical territory, so too can Texas establish causation between the 100-day pause and the costs it incurs from detaining and educating undocumented aliens." *Id*. at 630.

Because the 2022 Rule narrowed the definition of public charge, more aliens will be eligible for public benefits than previously were. The 2022 Rule only considers two situations in which an alien can be deemed a public charge: the receipt of cash benefits for income-maintenance or long term institutionalization at the governments' expense. Compl., ECF No. 1 at 14. This is in direct conflict with the language of the INA, which defines public benefits as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided[.]" 8 U.S.C. §§ 1611(c)(1)(B), 1621(c)(1)(B). As this Court explained, such a "sudden shift in immigration policy could cause immediate, unexpected, and acute harm to the State's budget. The potential for suffering such harm is direct and substantial." *Texas v. United States*, 524 F. Supp. 3d 598, 629 (S.D. Tex. 2021).

Accordingly, Texas can establish causation between the 2022 Rule's relaxed public charge standards and the costs it will incur providing social welfare benefits such as Medicaid. As Texas explained in its complaint, "[r]eductions in [public benefit] payments resulting from the enforcement of the INA as it is written would reduce spending on both these benefits and their administration." Compl., ECF No. 1 at 20. Texas further cites studies showing that the 2019 Rule would have saved the states over one billion dollars per year in public benefit spending. *Id*. By narrowing the definition of public charge, the 2022 Rule ensures that more benefits will be available to more aliens who would otherwise have been inadmissible, forcing Texas to expend more on providing and administering such benefits.

### C. Texas's claims are redressable by this Court.

The redressability prong of standing requires a showing "that the practical consequence of a declaration 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Ctr. for Inquiry, Inc. v. Warren*, 845 F. App'x 325, 328 (5th Cir. 2021) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). *See also Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) ("[T]o satisfy the . . . element of redressability . . . the plaintiff must show that the requested relief, if provided, will likely redress the injury-in-fact."). Furthermore, Plaintiffs "[a]re not required to show that their requested relief would *certainly* redress their injuries; rather, they [a]re required to show that their requested relief would *likely* (or substantially likely) redress their injuries." *Hancock Cty. Bd. of Supervisors*, 487 F. App'x at 197. Texas satisfies this standard.

As discussed, the special solicitude granted to the states "means redressability is easier to establish for certain state litigants than for other litigants—and this should remove any lingering doubts as to that prong." *State v. Biden*, 10 F.4th 538, 549 (5th Cir. 2021). Thus, a state "can assert [its] right[s] without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517-18 (2007) (alteration original).

Defendants assert that "Texas cannot establish redressability because a prior final court judgment has vacated the 2019 Rule; setting aside the 2022 Rule would not lead to the 2019 Rule's resurrection." Defs.' Motion to Dismiss, ECF No. 22 at 8.[2] Defendants omit to mention that Texas

---

[2] The 2019 Rule was challenged in several federal courts and its legality was slated to be considered by the Supreme Court following a grant of *certiorari* in *DHS v. New York*, 141 S. Ct. 1370 (2021). Defendants, relying on an injunction against the 2019 Rule granted by the Northern District of Illinois, dismissed all appeals, stopped defending the 2019 Rule, and resumed application of the Field Guidance in order to "implement the district court's vacatur." Inadmissibility on Public Charge Grounds; Interpretation of Vacatur, 86 Fed. Reg. 14,221, 14,221 (Mar. 15, 2021).

12

does not ask this Court to resurrect the 2019 Rule. Instead, Texas requests the vacatur and injunction of the 2022 Rule. Compl., ECF No. 1 at 23. These remedies would redress Texas's injury because they would require defendants to carry out Congress's intention of applying the broader definition of public charge found in PRWORA, IIRIRA, and all prior iterations of federal immigration law.

In the absence of the 2022 Rule, PRWORA and IIRIRA should control, not the 1999 Field Guidance. Although it was considered the controlling interpretation of the public charge provisions prior to the 2019 Rule, the Field Guidance should not be reverted back to because it disregards, and thus fails to implement, the Immigration and Nationality Act.

The Field Guidance deviated from the plain and conventional meaning of the term public charge. The Field Guidance advanced a novel meaning of public charge as "an alien who has become (for deportation purposes) or who is likely to become (for admission/adjustment purposes) 'primarily dependent on the government for subsistence, as demonstrated by either (i) receipt of public cash assistance for income maintenance; or (ii) institutionalization for long-term care at government expense.'" *Field Guidance on Deportability and Inadmissibility Public Charge Grounds*, 64 Fed. Reg. 28689 (1999) (citing Notice of Proposed Rulemaking, *Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28676 (1999)). Even a cursory comparison with the controlling statutory policies and provisions summarized above shows that the Field Guidance was an arbitrary restriction on the traditional notion of a public charge as a person dependent on government assistance, not merely particular forms of government assistance.

The Field Guidance was issued under two controversial theories. First, the INS claimed that the Field Guidance implemented a policy favoring access to non-cash entitlements, particularly health care, and asserted that the provision of public benefits other than Supplemental

Security Income, general relief, and long-term institutionalization to aliens "serve[s] important public interests." 64 Fed. Reg. 28689. This justification directly contradicts the statutory policy enacted by Congress that aliens should be excluded from eligibility for means-tested benefits, regardless of whether such benefits are "subsistence" or "supplementary" in nature. 8 U.S.C. § 1601 *et seq.* Indeed, the justification that there is a "public interest" in obtaining welfare benefits has been rejected in relevant litigation over prenatal care for illegal alien women. *See Lewis v. Thompson*, 252 F.3d 567, 579-82 (2d Cir. 2001) (finding "a clear congressional intent to deny federally-sponsored prenatal care to unqualified aliens.").

The plain language of PRWORA presumptively disqualified immigrant aliens from access to "all means-tested public benefits" for a lengthy period. PRWORA did not distinguish between cash and non-cash benefits or between subsistence and supplemental benefits for aliens. The "federal benefits" denied to non-qualified aliens under PRWORA included both non-cash and earned benefits such as health, disability, public housing, food assistance, unemployment benefits, and "any other similar benefit for which payments or assistance are provided . . . by an agency of the United States." 8 U.S.C. § 1611(c)(1). Congress made clear that noncitizens who are not "qualified aliens" are ineligible for any "means-tested benefit," including food stamps. Such aliens were only expected to be eligible for emergency medical care, public health assistance for communicable diseases, and short-term "soup kitchen"-type relief. 8 U.S.C. § 1611(b)(1).

For its part, IIRIRA provides that the income and resources of aliens who require an affidavit of support as a condition of admissibility are deemed to include the income and resources of the sponsor whenever the alien applies or reapplies for any means-tested public benefits program, without regard to whether the benefit is provided in cash, kind, or services, 8 U.S.C. § 1631(a), (c), although certain exceptions are applicable for battered spouses and children, 8 U.S.C.

14

§ 1631(f). This requirement also presumptively disqualified immigrant aliens from access to "all means-tested public benefits" for any lengthy period.

The second justification provided for the Field Guidance was that a lack of statutory or precedential authority allowed for a narrow definition of "public charge." This justification led to the administrative creation of a new substantive definition of the term in violation of basic principles of statutory interpretation, which strongly favor the traditional meaning of "public charge." Where a term is not expressly defined in a federal statute but has acquired an accepted meaning elsewhere in the law, the accepted meaning must be applied to that term. *See Sullivan v. Stroop*, 496 U.S. 478, 483 (1990) ("But where a phrase in a statute appears to have become a term of art . . . any attempt to break down the term into its constituent words is not apt to illuminate its meaning."). This is particularly true where, as was the case with the Field Guidance, an ordinary or natural meaning exists independently of a statutory definition. *See FDIC v. Meyer*, 510 U.S. 471, 476 (1994) ("The term . . . is not defined in the Act. In the absence of such definition, we construe a statutory term in accordance with its ordinary or natural meaning.").

The Field Guidance is unlawful, and should not be returned to, because it disregards the terms of the statutes it purportedly implements. Therefore, the last lawful statement of the public charge rule was IIRIRA and PRWORA themselves. These statutes, read together, reflect the longstanding desire of Congress that "aliens within the Nation's border not depend on public resources to meet their needs . . . and the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2). Vacatur of the 2022 Rule and an injunction against following the 2022 Rule, leaving the statutory public charge rule, as properly construed by this Court, as the controlling authority, would go far toward alleviating Texas's fiscal burden regarding public benefits for aliens—the exact harm Texas complains of.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: May 22, 2023                                          Respectfully submitted,

 /s/ Gina M. D'Andrea

Gina M. D'Andrea, *Pro Hac Vice*

Christopher J. Hajec
Immigration Reform Law Institute
25 Massachusetts Ave NW, Suite 335
Washington, DC 20001
202.232.5590
gdandrea@irli.org

*Attorneys for amicus curiae Immigration Reform Law Institute*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2023, a true and accurate copy of the foregoing document was filed electronically via CM/ECF and served on all counsel of record.

      /s/ Gina M. D'Andrea
      Gina M. D'Andrea