**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

|  |  |
|---|---|
| **STATE OF TEXAS**, <br><br> *Plaintiff,* <br><br> **v.** <br><br> **ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY; UR MENDOZA JADDOU, in her official capacity as Director of the United States Citizenship and Immigration Services; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and JOSEPH R. BIDEN, in his official capacity as President of the United States**, <br><br> *Defendants.* | Case No. 6:23-cv-00001 <br><br> Hon. Drew B. Tipton |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
FOR LACK OF JURISDICTION AND IMPROPER VENUE**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

      **I.**      TEXAS FAILS TO ESTABLISH STANDING ................................................ 2

            A.      Texas Has Not Established Injury In Fact ........................................... 3

            B.      Texas's Alleged Injury Is Neither Linked to the 2022 Rule Nor Redressable in this Action ................................................................... 8

            C.      Texas Is Not Entitled to Special Solicitude ....................................... 15

     **II.**      TEXAS HAS FAILED TO ESTABLISH VENUE ....................................... 17

CONCLUSION ............................................................................................................... 18

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ass'n of Cmty. Orgs. For Reform Now v. Fowler,*
  178 F.3d 350 (5th Cir. 1999) ..................................................................... 11

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
  458 U.S. 592 (1982) ............................................................................. 7, 15

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) .............................................................. 15, 16

*Arizona v. City and Cnty. of San Francisco,*
  142 S. Ct. 1926 (2022) ............................................................................ 13

*Atlanta & F. Ry. Co. v. Western Ry. Co. of Ala.,*
  50 F. 790 (5th Cir. 1892) ......................................................................... 17

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ................................................................... 17

*California v. Texas,*
  141 S. Ct. 2104 (2021) .................................................................... *passim*

*Campaign for S. Equality v. Bryant,*
  773 F.3d 55 (5th Cir. 2014) ....................................................................... 8

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .............................................................................. 3, 8

*Cook Cnty v. Wolf.,*
  498 F. Supp. 3d 999 (N.D. Ill. 2020) ...................................................... 13

*Cook Cnty. v. Wolf,*
  962 F.3d 208 (7th Cir. 2020) ..................................................................... 4

*DeOtte v. Azar,*
  332 F.R.D. 173 (N.D. Tex. 2019) ............................................................ 12

*Dep't of Com. v. New York,*
  139 S. Ct. 2551 (2019) ..................................................................... 1, 8, 9

*El Paso Cnty. v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ........................................................................... 14

*Harris v. McRae,*
    448 U.S. 297 (1980) .................................................................................... 6, 10

*Louisiana ex rel. Landry v. Biden,*
    64 F.4th 674 (5th Cir. 2023) ..................................................................... 14, 16

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................... 8, 9, 10

*Maryland v. King,*
    567 U.S. 1301 (2012) ........................................................................................ 7

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ........................................................................................ 15

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ........................................................................................ 10

*New York v. United States,*
    505 U.S. 144 (1992) ........................................................................................ 10

*Olberding v. Illinois Cent. R. Co.,*
    346 U.S. 338 (1953) ........................................................................................ 18

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976) ........................................................................................ 11

*Raines v. Byrd,*
    521 U.S. 811 (1997) .......................................................................................... 2

*Schweiker v. Gray Panthers,*
    453 U.S. 34 (1981) .......................................................................................... 10

*Segal v. Fifth Third Bank, N.A.,*
    581 F.3d 305 (6th Cir. 2009) ............................................................................ 6

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .......................................................................................... 3

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................................ 14

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
   581 U.S. 258 (2017) ............................................................................................ 18

*Texas v. U.S. Dep't of Homeland Sec.*,
   No. 6:23-CV-00007, 2023 WL 2457480 (S.D. Tex. Mar. 10, 2023) ................... 17

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) .................................................................................. 9

*Texas v. United States (DACA)*,
   50 F.4th 498 (5th Cir. 2022) ......................................................................... 7, 9, 15, 16

*Texas v. United States (DAPA)*,
   809 F.3d 134 (5th Cir. 2015) .......................................................................... 7, 8, 12

*Utah v. Walsh*,
   No. 2:23-CV-016-Z, 2023 WL 2663256 (N.D. Tex. Mar. 28, 2023) ................... 17

*Veasey v. Abbott*,
   870 F.3d 387 (5th Cir. 2017) .................................................................................. 7

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................................... 3

*Zimmerman v. City of Austin*,
   881 F.3d 378 (5th Cir. 2018) ................................................................................ 11

**Statutes**

8 U.S.C. § 1641 ........................................................................................................... 5

28 U.S.C. § 1391 ....................................................................................................... 17

42 U.S.C. § 1396a ..................................................................................................... 10

**Rules**

Fed. R. Civ. P. 12(b)(3) ............................................................................................... 2

iv

**Regulations**

84 Fed. Reg. 41,292 (Aug. 14, 2019)........................................................ 5, 9

87 Fed. Reg. 55,472 (Sept. 9, 2022)................................................... *passim*

**Other Authorities**

Kaiser Family Foundation, *Status of State Medicaid Expansion Decisions*,
    https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-
    decisions-interactive-map................................................................ 11

## INTRODUCTION

Texas's response sets forth a strange theory of injury.  The State cannot deny that "[n]either the statutory public charge ground of inadmissibility nor [the 2022] final rule govern *eligibility* for public benefits."  Public Charge Ground of Inadmissibility, 87 Fed. Reg. 55,472, 55,500 (Sept. 9, 2022) (2022 Rule) (emphasis added).  Nor can Texas plausibly demonstrate that the 2022 Rule will lead DHS to admit or to grant lawful permanent resident (LPR) status to *any* additional people who could burden the State's coffers.  Pls. Resp Br., ECF 25 at 6.  All available information thus indicates that the overall population of people eligible for public benefits will be the same with or without the rule.  Defs. Mot., ECF No. 22. at 8-10 (MTD).  How then does Texas try to establish standing to challenge DHS's rulemaking?  By claiming that people *not subject* to the public-charge inquiry are now going to be less fearful and confused about DHS's activities—and this will lead some unknown number of them to re-apply for benefits they were *already* eligible to receive. Pls. Resp. at 4-8.

States don't often claim to be injured by an agency *reducing* confusion and "unfounded fears" of unauthorized government action.  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).  And for good reason.  States cannot possibly have a cognizable interest in chilling people's participation in programs for which the State itself made them eligible.  Moreover, whatever injury Texas suffers from the use of those programs by people not subject to the 2022 Rule or its predecessor, those harms are attributable to other federal laws and the State's own legislative choices—not to the rules Texas is trying

to challenge.  So Texas cannot establish standing on the theory that an unknown number of people might now pursue State benefits they previously eschewed.

Texas's remaining arguments are no more persuasive.  Its claims that a favorable ruling from this Court will redress its injuries ignore that the chilling effects of the prior 2019 Rule—which "influenc[ed] primarily those individuals not subject to the rule," 87 Fed. Reg. at 55,500, and which Texas now applauds as "billions of dollars" in "sav[ings] . . . due to disenrollment and foregone enrollment in public benefits," Pls. Resp. at 1—was the product of confusion and fear that has since expired.  Further, the 2019 Rule, which Texas seeks to revive, has been vacated by another court's order:  an order that is not within this Court's power to set aside.  That itself would be sufficient grounds to dismiss this case.

Finally, Texas's insistence that it brought suit in the correct venue largely ignores the arguments Defendants offered in their motion.  Indeed, Texas provides no historical or logical justification for its choice of venue.  Given the deficiencies of Texas's standing arguments the Court need not reach the venue question.  But if the Court does reach the question, the Court should reject Texas's arguments and dismiss the case under Rule 12(b)(3).

## ARGUMENT

### I.    TEXAS FAILS TO ESTABLISH STANDING

One need not delve deep into Texas's legal theories to see an immediate problem. To satisfy Article III's "case-or-controversy requirement," Texas "based on [it] complaint, must establish that [it] ha[s] standing to sue."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

That is, the State "must 'clearly . . . allege facts demonstrating' each element" of the traditional inquiry—namely, (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted).  Yet Texas's response barely cites its complaint.  *See generally* Pls. Resp. at 4-10.  That is not surprising:  that complaint merely asserts that the State "has important interests in conserving its Medicaid and related social-welfare budgets" and notes that "the exact amount of Texas's Medicaid budget spent on aliens who would otherwise be inadmissible" but for the rule it challenges "has varied" over time.  Compl. ECF 1, ¶¶ 61-62.  An allegation so vague and so devoid of specifics fails "clearly to allege" *any* facts about injury, *Warth v. Seldin*, 422 U.S. 490, 518 (1975)—much less to establish a plausible basis for all the standing elements.  *See* MTD at 8-9.  So Texas's complaint can be dismissed on that basis alone.

Tellingly, Texas does not attempt to defend the sufficiency of its complaint's allegations.  Instead, Texas spins out its theories of injury, causation, and redressability based solely on information stated in DHS's underlying rules.  *See generally* Pls. Resp. at 5-10.  But doing so still cannot help Texas because its arguments fail at every turn.

## A.    Texas Has Not Established Injury In Fact

Texas frames its injury solely in terms of a hypothetical increased participation in its public benefit programs.  Pls. Resp. at 1.   But this increased participation is neither "certainly impending" nor a cognizable form of harm.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

1.     As a starting point, Texas fails to plausibly show that the 2022 Rule will lead to the admission of—or granting of LPR status to—any (much less any significant) number of people who would ever become eligible for public benefits.  Nor can it, given the documented history of the 2019 Rule.  Contrary to Texas's claims, Pls. Resp. at 6, that Rule was in effect for an entire year, yet did not ultimately lead to a *single* additional denial among more than 47,000 applications for adjustment of status.  *See* 87 Fed. Reg. at 55,473 (explaining that "of the 47,555 [nationwide] applications for adjustment of status to which the [2019] rule was applied, DHS issued only three denials (which were subsequently reopened and approved) and two Notices of Intent to Deny (which were ultimately rescinded, after which the applications were approved)"); *see also* MTD at 8-9.

Texas speculates that some people *may* not have been willing to seek adjustment of status under the old rule but will do so now.  Pls. Resp. at 7.  Yet the State has (1) provided *no* basis to believe that such people exist; (2) offered *no* indication how many of those hypothetical people will ultimately seek and obtain LPR status; and (3) given *no* estimates of how many of such doubly-speculative individuals are likely to actually *become* eligible for and obtain benefits *in Texas* five years later—something that is inherently uncertain given that DHS's public charge determination is made far in advance, based on a predictive judgment.[1]  *See* MTD at 9-10.  And Texas's speculation,

---

[1]  *See, e.g.*, *Cook Cnty. v. Wolf*, 962 F.3d 208, 237 (7th Cir. 2020) (noting that "the public charge determination is a 'prophetic' one" which requires DHS to "predict[] that an applicant is likely to rely too heavily on government assistance" in the future (citation omitted)) (Barrett, J., dissenting), *cert. dismissed sub nom.*, *Mayorkas v. Cook Cnty.*, 141 S. Ct. 1292 (2021)..

Pls. Resp. at 6, about additional people being admitted under the 2022 Rule is even further removed from any claims of injury, given that those people are generally not eligible for benefits at all *until* five years after they obtain LPR status.   *See* 8 U.S.C. § 1641; *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292, 41,313 (Aug. 14, 2019) (2019 Rule) ("Aliens who are unlawfully present and nonimmigrants physically present in the United States also are generally barred from receiving federal public benefits other than emergency assistance.").   In the face of this multi-layer cake of supposition, speculation, and hypothesis, Texas has not come close to plausibly showing that there is any likelihood that—when compared to the 2019 Rule—the 2022 Rule will increase the overall population of people *eligible* for the public benefits the State provides.

2.     To Texas's credit, it does not try particularly hard to establish standing on the ground that the 2022 Rule will increase the total universe of people *eligible* for benefits. Instead, it adopts a bolder theory.   Citing a plethora of statistics showing that the 2019 Rule "apparently resulted in widespread disenrollment effects among those who were not covered by that rule to begin with," 87 Fed. Reg. at 55,492, Texas claims that the revocation of that rule will cause the State injury because those people will now seek to re-enroll, Pls. Resp. at 1, 4-6.   According to Texas, it would save "billions of dollars . . . due to disenrollment and foregone enrollment in public benefits" if the 2019 Rule were still in effect.   *Id*. at 1.   In this way, Texas claims a fiscal interest in chilling an *existing* population from pursuing benefits to which they are *already* entitled under State law.   *See generally* 87 Fed. Reg. at 55,505 (noting that "the 2019 Final Rule caused fear and confusion among U.S. citizens and noncitizens and had a significant chilling effect on the use of

5

public benefits by noncitizens, even among those who were not subject to the rule and with respect to public benefits that were not covered by the rule"); *id*. at 55,500 (explaining that the "chilling effects that could be caused by the rule[] influenc[e] primarily those individuals not subject to the rule").  This boldly asserted theory has two fatal flaws.

*First*, Texas's new theory of injury runs counter to its complaint, which only claims financial harm from "aliens who would otherwise be inadmissible under the [2019] Rule."  Compl. ¶ 62.  Although Texas notes the general costs of administering its public-benefit programs, nowhere does the State assert harm from the utilization of those programs by people who are *not* subject to the public-charge inquiry.  *See* Compl. ¶¶ 60-64.  Because the complaint forms the operative pleading that defines the scope of this action, the Court cannot find standing on the basis of an entirely different population of people—who, it bears repeating, are not even subject to the rule Texas wishes to reinstate. *See, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2116 (2021) (declining to consider standing based on theory not raised below); *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 312 (6th Cir. 2009) (because plaintiff "'is the master of the complaint,'" he must "take responsibility for the allegations included in it").

*Second*, and more fundamentally, Texas fails to explain how *any* utilization of public benefit programs by people who are already eligible for such benefits—and not subject to either the 2019 or the 2022 public charge rule—can be considered a cognizable form of injury.  After all, even when it comes to Medicaid (which is the only program Texas alleges in its complaint), it is an underlying *State* choice to participate in the program that makes that existing population eligible for benefits in the first place.  *See,*

*e.g.*, *Harris v. McRae*, 448 U.S. 297, 301 (1980); *see infra* at 10-12.  Unlike other instances where States have incurred costs because a federal rule increased the population of people *eligible* for public benefits, here the size of the eligible population is definitionally not affected by DHS's determination; rather, it is *entirely* a product of Texas law.  *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 149 (5th Cir. 2015) (*DAPA*) (finding standing where DHS program "would allow otherwise ineligible aliens to become eligible for state-subsidized driver's licenses," thus driving up State costs); *Texas v. United States*, 50 F.4th 498, 517 (5th Cir. 2022) (*DACA*) (DHS program allowed beneficiaries to remain in the State, where they would incur medical expenses and require public education).  Those people's decisions to avail themselves of the benefits of those State laws cannot cause the State injury.  *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (State has "sovereign interest . . . [in] the power to create and enforce a legal code").  The State suffers an injury when it is *prevented* from "effectuating statutes enacted by representatives of its people"—not when those statutes are given effect.  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (State has a "public interest in the enforcement of its laws").

At its core, Texas's claim of injury amounts to a bald assertion that the State has a cognizable interest in "[r]educing costs by causing confusion among those who are not covered by [DHS's] rule, leading them to forgo benefits" that the State's own legislature has made available.  87 Fed. Reg. at 55,492.  Not surprisingly, Texas cites no authority to support such a remarkable claim.  *See* Pls. Resp. at 4-10.  And the Court should not countenance it.  As a general principle, Courts strive for the "avoidance of confusion."

*Campaign for S. Equal. v. Bryant*, 773 F.3d 55, 58 (5th Cir. 2014).  Texas suffers no injury from its own public benefits laws being observed.

**B.    Texas's Alleged Injury Is Neither Linked to the 2022 Rule Nor Redressable in this Action**

For similar reasons, the purported injuries Texas claims are neither traceable to the 2022 Rule nor redressable by Court order.

1.    Because Texas itself is not required to do or refrain from doing anything under the 2022 Rule, its asserted financial injury "arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else.*"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).  Under these circumstances, "a causal relation between injury and challenged action depends upon the decision of an independent third party (here an individual's decision to enroll in, say, Medicaid)."  *California*, 141 S. Ct. at 2117.  This makes causation "'substantially more difficult' to establish.'"  *Id.* (quoting *Lujan*, 504 U.S. at 562); *see also Clapper*, 568 U.S., at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").  To satisfy that burden, the plaintiff must show at least "that third parties will likely react in predictable ways."  *Dep't of Com.*, 139 S. Ct. at 2566.

Such a showing has been made in other cases when those third parties are the ones being regulated by government action.  Thus, for example, the Fifth Circuit found that Texas had standing where direct beneficiaries of DHS deferred-enforcement programs were likely to apply for driver licenses that would cost the State money.  *DAPA*, 809 F.3d at 160 (beneficiaries of DHS program were likely to apply for State-subsidized driver

licenses); *DACA*, 50 F.4th at 517 (beneficiaries of DHS program were likely to result in the State paying their medical expenses and public education cost). Similarly, in *Dep't of Commerce*, the Supreme Court recognized standing for a State that feared its residents would decline to respond to the census if the census form required them to indicate their citizenship status. 139 S. Ct. at 2565-66 (noting that State residents had a "legal duty to respond to the census"). And even in the recent immigration-priorities litigation, which the Supreme Court is currently reviewing, this Court and the Fifth Circuit concluded that Texas had established standing because DHS was directly acting on—and increasing— the population of immigrants in the State. *See generally Texas v. United State*s, 40 F.4th 205, 216-17 (5th Cir. 2022).

None of this is true here. The only non-speculative population that Texas asserts would cause the State fiscal injury are the people who were *not* subject to the 2019 Rule, but nevertheless disenrolled in public benefits because of confusion and fear. But those people's individual decisions to forgo benefits is not the predictable "response of the regulated (or regulable) third party to the government action or inaction" for Article III purposes. *Lujan*, 504 U.S. at 562. Rather, as DHS explained in the 2019 Rule, the decision "to disenroll from a public benefit program or forego enrollment in response to this rule when such individuals are not subject to this rule" is an "unwarranted choice[]." 84 Fed. Reg. at 41,313. Texas cites no case identifying standing based on the conduct of third parties who are themselves not being regulated by the government action being challenged. Simply put, those people exercise the "unfettered choices" of "independent actors not before the courts [] whose exercise of broad and legitimate discretion the courts

cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (citation omitted). Regardless of the statistical studies analyzing their behavior, those choices cannot reasonably create grounds for Texas's standing in this suit.

2.      Rather than being traceable to the 2022 Rule, the purported costs that Texas would incur from this population of currently-eligible residents re-enrolling in public benefits has a much more direct cause:  the federal or *State law* that entitles those residents to benefits in the first place.  Indeed, even the "Medicaid program," which is the only public benefit program Texas identifies in its complaint, "*is entirely optional*" and imposes federal guidelines only "once a State elects to participate."   *Harris*, 448 U.S. at 301 (emphasis added); *see also Schweiker v. Gray Panthers*, 453 U.S. 34, 36 (1981) (explaining that "[e]ach participating State develops a plan containing 'reasonable standards . . . for determining eligibility for and the extent of medical assistance'" (quoting 42 U.S.C. § 1396a(a)(17)); *see generally Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582–83 (2012) (*NFIB*) (discussing scope of conditions to which "States agreed . . . when they signed on [to Medicaid] in the first place").  Under our Constitution, the federal government cannot *compel* States to spend money.  *See New York v. United States*, 505 U.S. 144, 178 (1992) (Congress lacks power "to command a state government to enact state regulation . . . the Constitution simply does not give Congress the authority to require the States to regulate"); *see generally NFIB*, 567 U.S. at 577–78 (discussing anticommandeering principle that "has led this Court to strike down federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes").  So, to the extent

10

Texas is complaining about expenditure of State funds on benefit programs, those expenditures must—by necessity—be the State's choice.[2]

But, as the Supreme Court observed, "[n]o State can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury." (citing *Ass'n of Cmty. Orgs. For Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999))). Thus, the Supreme Court has previously found that several States lacked standing to contest other States' tax laws when the purported injury the States claimed—the loss of their own financial revenue— was entirely a product of the plaintiff States giving their residents credits for taxes paid to the other States. *Pennsylvania*, 426 U.S. at 663. As the Court explained, the injuries of which the plaintiff States complained were "self-inflicted, resulting from decisions by their respective state legislatures." *Id.* at 664. "Nothing required" the States "to extend a tax credit to their residents for income taxes paid" elsewhere "and nothing prevents [the States] from withdrawing that credit." *Id.*

So too here. Neither the 2022 Rule nor its predecessor requires Texas to extend benefit eligibility to the whole population that it now worries will re-enroll in those benefits. *See* 87 Fed. Reg. at 55,500 (noting that DHS's rule "does not intend to decide or

---

[2]   Indeed, Texas exercised this choice by not participating in the Medicaid expansion that Congress enacted as part of the Affordable Care Act. *See, e.g.,* Kaiser Family Foundation, *Status of State Medicaid Expansion Decisions,* https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map (last visited May 24, 2023).

impact which categories of noncitizens are, or should be, eligible to receive public benefits"). Nor, for that matter, do those rules preclude Texas from passing legislation to withdraw from Medicaid or otherwise to prevent people who were confused and dis-enrolled from benefits or declined to enroll despite being eligible from rejoining the rolls. As detailed above, the rules have no measurable effect on the population of people *eligible* for benefits.[3] So Texas has broad "options for accomplishing [its] policy goals" of driving people from the public benefit programs that it now claims injure its fisc. *DAPA*, 809 F.3d at 158. Regardless, Texas has no standing to complain about its own legislature's choices. As another court in this circuit recently explained, "a state lacks standing when the injury to its fisc arises from its legislative decision to pay monies." *DeOtte v. Azar*, 332 F.R.D. 173, 180–81 (N.D. Tex. 2019).

In short, "[t]he programs to which the state [] point[s] offer their recipients many benefits that have nothing to do with" either the 2019 or the 2022 public charge Rules. *California*, 141 S. Ct. at 2117–18. Because those rules do not increase the population of people *eligible* for benefits, Texas's purported injury is entirely the product of its own law.

3.      As the "flip side" of the same inquiry, Texas's injury is also not redressable in this action. The State contends that a "favorable ruling for Texas would reset the parties to March 9, 2021, and require Defendants to comply with the APA notice-and-comment process if they wish to repeal the 2019 Rule." Pls. Resp. at 10. But such a ruling would still not solve the underlying barrier to reanimating the 2019 Rule: its vacatur by

---

[3] This, again, is a critical feature distinguishing this case from the litigation over DAPA, DACA, immigration priorities, or even the census. *See supra* at 9.

the district court. *See Cook Cnty. v. Wolf*, 498 F. Supp. 3d 999, 1009-11 (N.D. Ill. 2020). Texas details the procedural history of that vacatur, intimating that there was something improper in the United States abandoning its appeal of the adverse ruling once the new administration determined that appeal was not in the United States's best interests. *See* Pls. Resp. at 9. But changing positions is routine with an incoming administration—and reflects the inherent discretion of the Executive to set policy consistent with the electorate's expressed wishes. *See, e.g., California*, 141 S. Ct. at 2116 (federal government abandoned defense of Affordable Care Act). And Texas's complaints about how that policy has been exercised does not provide this Court a vehicle to undo the final effects of another Court's order. *See, e.g., Arizona v. City & Cnty. of S.F.*, 142 S. Ct. 1926 (2022) (per curiam) (dismissing writ of certiorari from the Ninth Circuit's rejected of States' effort to defend the 2019 Rule after its vacatur).

Further, even if the Court were to find that the revocation of the 2019 Rule did not comport with the APA's requirements as Texas claims, Texas has failed to demonstrate that such a favorable ruling would resolve Texas's underlying fiscal injury. Because the vacatur of the 2019 Rule has been finalized by separate Court order, a ruling against DHS in this action would not restore that Rule. *See Cook Cnty.*, 498 F. Supp. 3d at 1004 (vacating 2019 Rule). Nor would an order from this Court restore the climate of uncertainty and fear that led people to disenroll in benefits following the 2019 Rule—which is what Texas claims to want. Indeed, Texas merely assumes that previously-chilled—and now supposedly un-chilled—people would *once again* be chilled by a Court order, and thus decline to pursue benefits. But such a third-order assumption cannot satisfy Texas's

13

burden to "show 'a substantial likelihood' that the requested relief will remedy the alleged injury in fact.'"  *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) (quoting *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000)).[4]

Absent a demonstration that a favorable ruling will remedy that underlying fiscal injury, Texas cannot establish redressability merely by claiming that a favorable ruling will "require Defendant to comply with the APA notice-and-comment process . . . to repeal the 2019 Rule."  Pls. Resp. at 10.  It "is well established that the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.'"  *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 683 (5th Cir. 2023) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).  The prospect of a legal victory on a procedural violation thus cannot by itself establish jurisdiction.  Were it otherwise, Article III limitations would mean nothing in an APA suit.  *See, e.g., id.*

\* \* \*

In short, because Texas's public benefit "programs . . . offer their recipients many benefits that have nothing to do with the" rules Texas is challenging, Texas has failed to establish any of the necessary elements for standing, and its complaint should be dismissed.  *California*, 141 S. Ct. at 2117–18.

---

[4]  Indeed, such an assumption is entirely speculative given that, in the absence of any operative public charge rule at all, the agency will merely default to making public charge determinations directly under the statute—which, in practical terms, is likely to be similar to the 1999 Field Guidance.  *See* MTD at 11.  So Texas's claims about the Guidance being superseded are all beside the point.

### C.      Texas Is Not Entitled to Special Solicitude

Nor can Texas overcome the deficiency of its complaint or standing theories by claiming that it is entitled to special solicitude.  States may sometimes receive "special solicitude"—and thus benefit from relaxed causation and redressability requirements—when they identify a "procedural right to challenge" an administrative decision that affects their "quasi-sovereign interests."  *DACA*, 50 F.4th at 514; *see also Massachusetts v. EPA*, 549 U.S. 497 (2007).  But, as Texas itself concedes, quasi-sovereign interests do *not* include "'proprietary interests, or private interests pursued by the State as a nominal party.'"  Pls. Resp. at 2 (quoting *Alfred L. Snapp & Son* , 458 U.S. at 602).  Yet that is exactly the interest Texas is claiming here.  As noted above, Texas's purported injury is merely the loss of State funds to public benefit recipients—a classic proprietary injury.  *See, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022).  No special solicitude is available to States seeking to vindicate a financial loss.  *Id.*

Texas attempts to evade this straightforward fact by quoting the Fifth Circuit's recent DACA decision, which observed that "[t]he importance of immigration policy and its consequences to Texas, coupled with the restraints on Texas' power to make it, create a quasi-sovereign interest."  *DACA*, 50 F.4th at 515-16.  But the Court made that observation in the context of a program that it found to "implicate[] preemption concerns" because it deprived the State of the ability to "establish an alternative classification system or work authorization[]" for undocumented aliens.  *Id.* (State's "inability to legislate around DACA can create a quasi-sovereign interest").  Citing the Supreme Court's decision in *Massachusetts*, the Court observed that the State there "had

a quasi-sovereign interest because it could not regulate greenhouse gases." *Id.* at 516. No such concern exists here.

As noted above, and detailed in Defendants' motion to dismiss, the public charge rules *do not* preempt any State legislation, nor prelude the State from doing anything it would otherwise want to do. *See, e.g.*, 87 Fed. Reg. at 55,500 (noting that the 2022 Rule does not "govern eligibility for public benefits"). Contrary to Texas's assertion, Texas is free to "legislate in the area of" providing for—or withdrawing—public benefits with or without DHS's public charge rules. Pls. Resp. at 4. And, tellingly, Texas's complaint does not allege otherwise. *See id.*; *see generally* Compl. ¶¶ 60-64 (detailing 2022 Rule's alleged effect on Texas).

Indeed, Texas has exercised its prerogative to provide for public benefit eligibility entirely free from DHS's interference. Now it is merely claiming purported "indirect fiscal burdens" from the actions of people *not* subject to DHS's rules, whose entitlement to the programs the State itself established. *Arizona*, 40 F.4th at 386. This combination of fiscal injury and the State's own legislative choices defeat Texas's claims to special solicitude. *La. ex rel. Landry*, 64 F.4th at 683 (rejecting special solicitude where challenged action did not have "direct effect on [states'] law or policy"). And they also torpedo the State's efforts to establish the requisite injury, traceability, and redressability in this suit.

## II.   TEXAS HAS FAILED TO ESTABLISH VENUE

Given the jurisdictional defects of Texas's complaint, the Court need not even reach the venue question.  But there too Texas has failed to establish that it can maintain this lawsuit.

As Defendants detailed at length in their motion, recognizing Texas's residency in this district is irreconcilable with the history of the venue provision, 28 U.S.C. § 1391(e).  MTD at 13-16.  Congress specifically promulgated that statute because it recognized that neither the federal government nor its entities reside everywhere within the United States's borders.  *Id.*  And Courts have applied the same logic to corporations.  *Id.*  Texas confirms that these residency principles have been "well-settled."  Pls. Resp. at 12.  Yet it provides no logical or legal basis to treat States differently:  it neither adduces legislative history nor any other authority to support the proposition that States are entitled to a different standard.  *Id.*  Neither logic nor history supports that result.

Texas is, of course, correct that numerous courts—including this one—have reached a different conclusion.  Respectfully, however, none of those decisions analyze the specific argument that Defendants have presented here.  *See, e.g., Utah v. Walsh*, No. 2:23-CV-016-Z, 2023 WL 2663256, *4 (N.D. Tex. Mar. 28, 2023); s*ee also Texas v. U.S. Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2023 WL 2457480, at *3 (S.D. Tex. Mar. 10, 2023); *Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892); *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).  As Defendants detailed in their motion (and Texas does not contest), those cases do not bind the Court, and they address neither the history of § 1391(e) nor the anomaly that would result if States were treated differently from other

17

sovereigns for purposes of residency.  Rather than follow those decisions, this Court should follow the Supreme Court's admonitions about interpreting the venue provisions strictly, considering their history and context.  *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 263-64 (2017); *Olberding v. Ill. Cent. R. Co.*, 346 U.S. 338, 340 (1953) ("The requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction.").

Following that framework clearly demonstrates that Texas does not reside in this district and therefore cannot take advantage of § 1391(e)'s venue provisions to bring suit here.  Especially given the jurisdictional obstacles that stand in the way of Texas pursuing this lawsuit, dismissal is the appropriate course.  *See* MTD at 18.

## CONCLUSION

For these reasons, and those detailed in Defendants' motion to dismiss, the Court should dismiss Texas's complaint.

Dated:  May 26, 2023                      Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          Principal Deputy Assistant Attorney General

                                          ALAMDAR HAMDANI
                                          United States Attorney

                                          BRIGHAM J. BOWEN
                                          Assistant Branch Director

                                          */s/ Alexander V. Sverdlov*
                                          Alexander V. Sverdlov (N.Y. Bar No. 4918793)
                                          Attorney-in-Charge / Admitted Pro Hac Vice
                                          Christopher A. Eiswerth (D.C. Bar 1029490)
                                          Admitted Pro Hac Vice
                                          Trial Attorneys
                                          U.S. Department of Justice
                                          Federal Programs Branch, Civil Division
                                          1100 L St., N.W.
                                          Washington, D.C. 20005
                                          Tel: (202) 305-8550 / Fax: (202) 616-8460
                                          alexander.v.sverdlov@usdoj.gov
                                          christopher.a.eiswerth@usdoj.gov

                                          Lance Duke
                                          Assistant United States Attorney
                                          Southern District of Texas
                                          800 N. Shoreline Blvd., Ste. 500
                                          Tel: (361) 446-2890
                                          Fax: (361) 888-3200
                                          lance.duke@usdoj.gov

                                          *Counsel for Defendants*

19