# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

STATE OF TEXAS,

<em>Plaintiff</em>,

v.

ALEJANDRO MAYORKAS, et al.,

<em>Defendants</em>.

Case No. 6:23-cv-00001

## ~~PROPOSED~~ BRIEF FOR AMICI CURIAE STATES OF CALIFORNIA, NEW YORK, COLORADO, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW JERSEY, NEVADA, OREGON, WASHINGTON, AND THE DISTRICT OF COLUMBIA

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTERESTS OF AMICI CURIAE ........................................... 1

STATEMENT .................................................................................................. 3

SUMMARY OF THE ARGUMENT .................................................................. 7

ARGUMENT .................................................................................................. 8

    I.       The 2022 Final Rule is Not Contrary to Law ........................................... 8

    II.      The 2022 Final Rule Is Not Arbitrary or Capricious ............................... 11

           A.      Defendants Appropriately Considered Chilling Effects ............. 11

           B.      The 2019 Rule's Serious Harms Support the 2022 Final Rule ................................................................................................ 13

           C.      DHS Appropriately Determined that the 2019 Rule's Purported Benefits Did Not Outweigh Its Harms ........................ 16

CONCLUSION ............................................................................................ 17

# TABLE OF AUTHORITIES

Page

**Cases**

*CASA de Md., Inc. v. Trump,*
    971 F.3d 220 (4th Cir.), *reh'g en banc granted*, 981 F.3d 311.................................6, 10

*City and County of San Francisco v. U.S. Citizenship and Imm. Servs.,*
    981 F.3d 742 (9th Cir. 2020) ...........................................................................3, 6, 9, 10

*Cook County v. Wolf,*
    498 F. Supp. 3d 999 (N.D. Ill. 2020) ..................................................................6

*Cook County v. Wolf,*
    962 F.3d 208 (7th Cir. 2020) ....................................................................6, 9, 10

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009).............................................................................................11

*Gegiow v. Uhl,*
    239 U.S. 3 (1915)..................................................................................................4

*Howe v. United States,*
    247 F. 292 (2d Cir. 1917) ....................................................................................4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)...............................................................................................11

*New York v. U.S. Dep't of Homeland Sec.,*
    969 F.3d 42 (2d Cir. 2020)........................................................................... *passim*

*Texas v. Biden,*
    589 F. Supp. 3d 595 (N.D. Tex. 2022) ......................................................16

**Statutes**

5 U.S.C.
    § 706(2).................................................................................................................8
    § 706(2)(A) ..........................................................................................................11

8 U.S.C.
    § 1101(a)(3) ..........................................................................................................5
    § 1182(a)(4)(A)—a...........................................................................................1.3,8
    § 1182(a)(4)(c)(ii)...............................................................................................10
    § 1183a(b)(1)(A)................................................................................................10

ii

**TABLE OF AUTHORITIES**
**(continued)**

Page

**Code of Federal Regulations**

    8 C.F.R. § 212.21(a)................................................................................................1

**Federal Register Volumes** (by date)

Field Guidance on Deportability and Inadmissibility on Public Charge
    Grounds, 64 Fed. Reg. 28,689 (May 26, 1999) ............................................5

Inadmissibility on Public Charge Grounds, Notice of Proposed
    Rulemaking, 83 Fed. Reg. 51,270 (Oct. 10, 2018) .....................................14

Inadmissibility on Public Charge Grounds, Final Rule, 84 Fed. Reg.
    41,292 (Aug. 14, 2019)........................................................................ *passim*

Public Charge Ground of Inadmissibility, Advance Notice of Proposed
    Rulemaking, 86 Fed. Reg. 86 47,025 (Aug. 23, 2001)..................................6

Public Charge Ground of Inadmissibility, Notice of Proposed Rulemaking,
    87 Fed. Reg. 10,570 (Feb. 24, 2022) .............................................................6

Public Charge Ground of Inadmissibility, Final Rule 87 Fed. Reg. 55,472.
    (Sept. 9, 2022).................................................................................... *passim*

**Public Comments**

(All Comments in Dep't of Homeland Security, Docket No. USCIC-2021-
    0013, Public Charge Ground of Inadmissibility (posted Sept. 8, 2022),
    https://www.regulations.gov/document/USCIS-2021-0013-0432)

AHIP Comment (Oct. 22, 2021),
    https://www.regulations.gov/comment/USCIS-2021-0013-0071 ...............14

Attorneys General of California, New York, eighteen other States and the
    District of Columbia (Oct. 22, 2021),
    https://www.regulations.gov/comment/USCIS-2021-0013-0116 .................7

Attorneys General of California, New York, eighteen other States and the
    District of Columbia (Apr. 25, 2022),
    https://www.regulations.gov/comment/USCIS-2021-0013-0390...............7, 13, 14, 15

City of New York Comment (Oct. 25, 2021),
    https://www.regulations.gov/comment/USCIS-2021-0013-0153..................7

**TABLE OF AUTHORITIES**
**(continued)**

Page

Children's HealthWatch Comment (Oct. 25, 2021),
    https://www.regulations.gov/comment/USCIS-2021-0013-0105................................15

Dep't of Vermont Health Access Comment (Oct. 22, 2021),
    https://www.regulations.gov/comment/USCIS-2021-0013-0121..................................7

Latino Community Asset Builders Comment (Apr. 25, 2022),
    https://www.regulations.gov/comment/USCIS-2021-0013-0419 ...............................15

Legacy Community Health Comment (Apr. 25, 2022),
    https://www.regulations.gov/comment/USCIS-2021-0013-0340..................................7

National Association of Community Health Centers Comment (Oct. 22,
    2021), https://www.regulations.gov/comment/USCIS-2021-0013-0157 ...................16

New York State Dep't of Health Comment (Oct. 22, 2021),
    https://www.regulations.gov/comment/USCIS-2021-0013-0126..................................7

Public Health Scholars Comment (Apr. 25, 2022),
    https://www.regulations.gov/comment/USCIS-2021-0013-0328..........................12, 14

School Nutrition Association Comment (Apr. 25, 2022),
    https://www.regulations.gov/comment/USCIS-2021-0013-0321................................15

Wisconsin Dep't of Health Servs. Comment (Oct. 25, 2021),
    https://www.regulations.gov/comment/USCIS-2021-0013-0124..................................7

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

Amici States of California, New York, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Washington, and the District of Columbia respectfully submit this brief as *amici curiae* in support of Defendants, both in opposing Plaintiff State of Texas's motion for summary judgment and in making their own cross-motion for summary judgment.  This case challenges a 2022 regulation issued by the U.S. Department of Homeland Security (DHS) codifying the longstanding understanding of the term "public charge" in 8 U.S.C. § 1182(a)(4)(A)—a federal immigration statute that allows immigration officers to bar admission or adjustment of status of an applicant who "is likely at any time to become a public charge."  The new rule replaces DHS's now-vacated rule from 2019, which had contravened the law's settled meaning, and decades of DHS's own guidance, by vastly expanding "public charge" to include individuals who receive certain publicly funded supplemental benefits—even though Congress designed these benefits to supplement health, nutrition, and economic stability rather than to provide long-term subsistence. *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("2019 Rule").  DHS has now affirmed the longstanding meaning of "public charge" as noncitizens "likely at any time to become primarily dependent on the government for subsistence as demonstrated by either the receipt of public cash assistance for income maintenance, or long-term institutionalization at government expense," 8 C.F.R. § 212.21(a); *see generally* Public Charge Ground of Inadmissibility Final Rule, 87 Fed Reg. 55,472 (Sept. 9, 2022) ("2022 Final Rule").  Plaintiff contends that DHS is required by statute to maintain the 2019 Rule's novel definition.

Amici States have substantial interests in the proper interpretation of the public charge statute because of its direct effects on the wellbeing of immigrants living in Amici States'

1

jurisdictions, public health and nutrition, and Amici States' administration of public benefits. Amici States are home to some of our Nation's largest immigrant populations—more than 25 million[1]—who are valued and active contributors to our communities, work forces, and civic organizations.  These state residents attend school, serve as essential workers, enlist in the military, and care for the sick and the elderly.  Immigrants add billions of dollars to federal, state, and local budgets by paying taxes and spending their income.  And millions of members of immigrant families are U.S. citizens.

Plaintiff's expansive reading of the public charge statute would severely harm these immigrants, their U.S. citizen family members, and Amici States.  As Amici States' experience with the 2019 Rule shows, Plaintiff's desired expansion of the meaning of "public charge" would substantially chill immigrants and their family members from accessing public programs like Medicaid and food assistance for children and infants—even though these benefits are designed to promote public health, nutrition, and upward mobility rather than to provide long-term subsistence.  Indeed, the 2019 Rule's predictable consequences included reductions in childhood immunization rates and avoidance of medical care and nutritional programs.  These chilling effects would repeat themselves if the Court were to accept Plaintiff's interpretation of the statute, harming public health and nutrition, interfering with Amici States' administration of public benefit programs, and increasing burdens on safety net hospitals and other healthcare providers of last resort.

---

[1] *See* Am. Immigration Council, *Map the Impact of Immigration*, https://data.americanimmigrationcouncil.org/map-the-impact/ (filtered by State) (last visited Oct. 27, 2023).

**STATEMENT**

The Immigration and Nationality Act (INA) bars admission of "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the [Secretary of Homeland Security] at the time of application for admission or adjustment of status, is likely at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).  Under federal immigration law, "public charge" is a term that Congress adopted and maintained for more than a century and that the federal judiciary and immigration agencies consistently applied to exclude only "an individual with the inherent inability to be self-supporting" —until the 2019 Rule.  *City and County of San Francisco v. U.S. Citizenship and Imm. Servs.*, 981 F.3d 742, 752 (9th Cir. 2020), *cert. dismissed*, 141 S. Ct. 1292 (2021) (citing *Matter of Harutunian*, 14 I & N. Dec. 583, 589-90 (BIA 1974)).

Since the late nineteenth century, federal law has barred persons likely to become a public charge from admission into the United States.  In 1882, Congress rendered any "convict, lunatic, idiot, or any person unable to take care of [themselves] without becoming a public charge" excludable and prevented them from entering the country. Immigration Act of 1882, Pub. L. No. 47-376, ch. 376, § 2, 22 Stat. 214.  "Public charge" thus was understood to refer to the fraction of immigrants likely to "become life-long dependents on our public charities."  13 Cong. Rec. 5109 (1882) (statement of Rep. Van Voorhis).  Congress did not exclude immigrants who might be poor or require some public assistance to promote their wellbeing or upward mobility; legislators recognized that such persons could "become a valuable component part of the body-politic."  *Id.* at 5108.  Indeed, Congress directed the collection of a per-person tax "for the support and relief" of immigrants who "may fall into distress or need public aid," Immigration Act of 1882, §§ 1-2, 22 Stat. at 214, to fund support for immigrants "when they arrive . . . until they can proceed to other places or obtain occupation for their support,"  13 Cong

3

Rec. 5106 (statement of Rep. Reagan).  In the decades that followed, Congress repeatedly

reenacted substantially similar public charge provisions, which courts interpreted as being

limited to the few individuals who were unable to support themselves and were thus likely to

depend almost entirely on the government for long-term subsistence.  *See, e.g.*, *Gegiow v. Uhl*,

239 U.S. 3, 10 (1915) ("public charge" means individuals unable to work due to "permanent

personal objections"); *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917) ("Congress meant

the act to exclude persons who were likely to become occupants of almshouses for want of

means with which to support themselves in the future.").

Congress ratified this established meaning of "public charge" into the INA when it

reenacted the public charge ground of inadmissibility "without pertinent change" in 1952 and

again in 1996.  *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 70 (2d Cir. 2020), *cert.*

*granted*, 141 S. Ct. 1370, *cert. dismissed*, 141 S. Ct. 1292 (2021).  Before and throughout that

time period, "[t]he absolute bulk of the caselaw, from the Supreme Court, the circuit courts, and

the [Board of Immigration Appeals (BIA)] interprets 'public charge' to mean a person who is

unable to support herself, either through work, savings, or family ties." *Id.* at 71.  For example, in

1962, the U.S. Attorney General "summarize[d] the 'extensive judicial interpretation' of the term

as requiring a particular circumstance, like disability or age, that shows that 'the burden of

supporting the alien is likely to be cast on the public[.]'"  *Id.* (quoting *Matter of Martinez-Lopez*,

10 I. & N. Dec. 409, 421 (A.G. 1962)).  "The BIA came to a similar conclusion after its own

review of the public charge caselaw and legislative history" and "rejected the notion that receipt

of public benefits categorically renders one a public charge."  *Id.*

In 1999, the former Immigration and Naturalization Service issued formal guidance

"summariz[ing] longstanding law" and explaining that the term "public charge" covers only

4

those noncitizens[2] "likely to become . . . primarily dependent on the government for subsistence."  64 Fed. Reg. 28,689, 28,689 (May 26, 1999) (quotation marks omitted).  Under this guidance, an individual could be found "primarily dependent on the government" based on receipt of public cash assistance for income maintenance or institutionalization for long-term care at public expense.  *Id*.  But immigration officials did not give "weight [to] the receipt of non-cash public benefits (other than institutionalization) or the receipt of cash benefits for purposes other than for income maintenance" in making public charge assessments.  *Id*.  As the federal agency explained, such supplemental benefits are available "to families with incomes far above the poverty level," *id*. at 28,692, to further public health and upward mobility rather than long-term subsistence.  The federal government continued to interpret the term "public charge" consistent with this guidance, and with more than a century of prior precedent, for the next 20 years.  *See* 87 Fed. Reg. at 55,472, 55,495.

Two decades after issuing the 1999 guidance, the federal executive branch abruptly changed course.  In its 2019 Rule, DHS adopted a novel and expansive definition of "public charge," which included "an alien who receives one or more public benefits," as specified by the rule, "for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)."  84 Fed. Reg. 41,292, 41,501 (Aug. 14, 2019).  This meant that an individual could be deemed inadmissible if found "likely to receive as little as $20 a month in SNAP [Supplemental Nutrition Assistance Program] benefits for a year."  87 Fed. Reg. at 55,519.  The specified benefits included not just "cash assistance for income maintenance," *id.* at 55,518, and government paid in-kind care at a nursing

---

[2] This brief uses "noncitizen" in place of the statutory term "alien," which refers to "any person not a citizen or national of the United States."  8 U.S.C. § 1101(a)(3). It also uses "immigrant" to refer more broadly to all foreign-born individuals, including those who have been naturalized.

home or other institution, but also most Medicaid healthcare coverage and SNAP—common, publicly funded supplemental benefits available to individuals with incomes above the poverty line and designed to promote public health, nutrition, and upward mobility rather than long-term subsistence. *See id.* at 55,518-19.

Amici States, and many others, challenged the 2019 Rule as arbitrary, capricious, and contrary to the INA. The U.S. Courts of Appeals for the Second, Seventh, and Ninth Circuits substantially affirmed preliminary injunctions in their respective jurisdictions. These courts held that the 2019 Rule's definition of "public charge" could not be squared with the historical understanding of that term, which, at minimum, "requires a degree of dependence that goes beyond temporary receipt of supplemental in-kind benefits from any type of public agency." *Cook County v. Wolf*, 962 F.3d 208, 229 (7th Cir. 2020), *cert. dismissed*, 141 S. Ct. 1292 (2021); *see also New York*, 969 F.3d at 74-80; *San Francisco*, 981 F.3d at 756-58. A Fourth Circuit panel initially concluded that the 2019 Rule was likely valid, but subsequently granted rehearing *en banc* and vacated the previous panel judgment and opinion. *See CASA de Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir.), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020), *appeal dismissed*, No. 19-2222, C.A. Doc. 211 (4th Cir. Mar. 11, 2021). In March 2021, the Illinois district court vacated the 2019 Rule as arbitrary, capricious, and contrary to law, in violation of the the APA. *See Cook County v. Wolf*, 498 F. Supp. 3d 999, 1004-05 (N.D. Ill. 2020).

DHS published the final rule on December 23, 2022, following an "Advance Notice of Proposed Rulemaking" to collect relevant "empirical evidence to the extent relevant and available," 86 Fed. Reg. 47,025 (Aug. 23, 2001) and a formal notice and comment period, 87 Fed. Reg. 10,570 (Feb. 24, 2022). Amici States submitted comments at each opportunity, describing their jurisdictions' experiences with the 2019 Rule, such as residents' increasing

6

reluctance to enroll in Medicaid coverage, decreased utilization of preventive healthcare services, and additional costs and administrative burdens on state benefit-granting agencies and healthcare providers.[3]  These included significant declines in participation in programs like SNAP and the Supplemental Nutrition Program for Women, Infants, and Children (WIC), including among U.S. citizen children living with noncitizens.[4]  Many others commented as well, including the largest network of federally qualified health centers in Texas, which noted that the 2019 Rule's chilling effect affected "22% of Texas Medicaid and CHIP populations, one of the highest impacts in the nation," and urged DHS to exclude those supplemental benefits.[5]

## SUMMARY OF THE ARGUMENT

Defendants acted lawfully when they promulgated the 2022 Final Rule.  First, the 2022 Final Rule is not contrary to law.  DHS's position that the public charge statute encompasses receipt of cash benefits for income maintenance or institutionalization, but not receipt of temporary and/or supplemental benefits designed to promote public health and upward of mobility rather than long-term subsistence, is consistent with longstanding principles that have guided admission to the United States for more than a century.  Most courts to consider the question have concluded that the term "public charge" does not encompass the receipt of temporary and/or supplemental benefits.  And no court has held that the statutory term "public charge" *must* include consideration of such benefits, as Plaintiff asserts.  At an absolute

---

[3] Attorneys General of California, New York, et al. ("Amici States") Comment (Oct. 22, 2021).  Comments cited are contained in Dkt. No. USCIC-2021-0013, Public Charge Ground of Inadmissibility (Sept. 8, 2022), https://www.regulations.gov/document/USCIS-2021-0013-0432.

[4] City of New York Comment (Oct. 25, 2021), pp. 12-13; *see also* Wisconsin Dep't of Health Servs. Comment (Oct. 25, 2021); Dep't of Vermont Health Access Comment (Oct. 22, 2021); Amici States Comment (Apr. 25, 2022); New York State Dep't of Health Comment (Oct. 22, 2021).

[5] Legacy Community Health Comment (Apr. 25, 2022).

minimum, DHS's construction of the statute to exclude consideration of such benefits is at least reasonable.

Second, the 2022 Final Rule properly reflects DHS's reasoned decision that the harms of the 2019 Rule's expansive public charge policy outweighed its purported benefits (if any). DHS properly examined relevant data in the administrative record, including substantial new reports and studies about the actual effects of the 2019 Rule, that supported its decision not to return to the 2019 Rule. That evidence includes the 2019 Rule's severe, negative effects on the health and wellbeing of immigrants and their U.S. citizen family members, as well as harms to Amici States' ability to administer a range of programs, from safety net hospitals to school lunch. DHS also expressly considered the estimated costs of the 2022 Final Rule that Plaintiff now highlights, and rationally explained why those costs did not warrant altering the Final Rule.

## ARGUMENT

### I.   THE 2022 FINAL RULE IS NOT CONTRARY TO LAW

The APA requires courts to set aside agency rulemaking that is "not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). The 2022 Final Rule is not contrary to law under the APA because 8 U.S.C. § 1182(a)(4) does not require DHS to consider supplemental, non-cash benefits when determining whether a noncitizen is "likely at any time to become a public charge."

Indeed, most courts to consider the question have found that the INA's public charge provision cannot be reasonably read to include individuals receiving temporary and/or supplemental benefits that promote public health, nutrition, and upward mobility, as opposed to benefits that provide long-term subsistence. Instead, the "settled meaning of 'public charge,' as the plain meaning of the term already suggests, is dependency: being a persistent 'charge' on the public purse." *New York*, 969 F.3d at 74. That settled meaning derives from a century of

judicial precedent and decades of administrative decisions based on "comprehensive reviews of public charge history"—which Congress ultimately ratified. *Id.* at 71-72; *see supra* at 4.  At minimum, "[t]he term requires a degree of dependence that goes beyond temporary receipt of supplemental in-kind benefits from any type of public agency."  *Cook County*, 962 F.3d at 229; *see also San Francisco*, 981 F.3d at 758 (finding 2019 Rule inconsistent with "any reasonable interpretation" of the statute).

Plaintiff ignores this history and authority in arguing that the 2022 Final Rule's definition of "public charge" "conflicts with the clear statutory meaning" of the term.  *See* Pl.'s Mot. for Summ. J. ("Mot.") at 18.  At the outset, this argument squarely contradicts Plaintiff's previous litigation position (in defense of the 2019 Rule) that the term "public charge" has no clear meaning and thus affords DHS discretion in defining its bounds.  *See* Pet. for Cert. at 27, *Arizona v. City and County of San Francisco*, No. 20-1775 (U.S. June 18, 2021) (arguing that "'public charge' does not have a fixed unambiguous meaning" and that "the Executive Branch has been afforded the discretion to interpret it") (quoting *City and County of San Francisco v. U.S. Citizenship and Imm. Servs.*, 944 F.3d 773, 796-97 (9th Cir. 2019)).

In any event, the opinions on which Plaintiff relies—the now-vacated Fourth Circuit decision in *CASA de Maryland* and then-Judge Barrett's dissent in *Cook County*—dispose of Plaintiff's argument.  Neither opinion said that any statute *requires* "that non-cash benefits be considered when determining if an alien is 'likely at any time to become a public charge.'"  *See* Mot. at 17. To the contrary, both opinions would have upheld the 2019 Rule as a permissible interpretation of an ambiguous statute.  The Fourth Circuit in fact concluded that "*both* the [2019 Rule] and the 1999 Field guidance may be seen to rest on sound footing" because the term "public charge" "enjoys, in practice, a certain ambiguity, giving the executive discretion over the

type, amount, and duration of public assistance that will render someone a 'public charge.'" 971 F.3d at 244; *see also Cook County*, 962 F.3d at 253 (Barrett, J., dissenting) (noting that "DHS could have exercised its discretion differently"). Plaintiff's current position that DHS *must* consider supplemental benefits when making public charge determinations is thus contravened by the very opinions on which it relies.

Plaintiff also asserts that the 2022 Final Rule is contrary to law because it "directly conflicts" with the 1996 Welfare Reform Act's definition of "public benefits." Mot. at 18 (citing 8 U.S.C. §§ 1611(c)(1)(B), 1621(c)(1)(B)). But no court has concluded that that legislation's definition of "public benefits" altered the meaning of the term "public charge" in the INA, a separate statute. To the contrary, the Welfare Reform Act's preservation of public benefits for noncitizens is "in considerable tension" with Plaintiff's argument that Congress intended to use the public charge statute to penalize noncitizens who use such benefits. *See New York*, 969 F.3d at 77-78; *Cook County*, 962 F.3d at 228 ("The statute did not […] modify the public-charge provision to penalize receipt of non-cash […] assistance."). And the Act does not "indicate any congressional intention that non-citizens who receive the benefits for which Congress did *not* render them ineligible risk being considered 'public charges.'" *New York*, 969 F.3d at 77.

Plaintiff also misplaces its reliance on an affidavit-of-support provision that allows governments to seek reimbursement from an immigrant's sponsor for means-tested public benefits used by the sponsored immigrant. *See* 8 U.S.C. §§ 1182(a)(4)(c)(ii), 1183a(b)(1)(A). Plaintiff's argument is contravened by the history of both the public-charge provision, *see San Francisco*, 981 F.3d at 757-58, and the affidavit-of-support provision, which serves "to get sponsors to take their commitments seriously by making them legally enforceable," *New York*, 969 F.3d at 79, rather than to "depart from the settled meaning of 'public charge,'" *id.* at 80.

10

## II.  THE 2022 FINAL RULE IS NOT ARBITRARY OR CAPRICIOUS

The 2022 Final Rule also does not violate the APA's prohibition on "arbitrary or capricious" decisionmaking.  5 U.S.C. § 706(2)(A).  When rulemaking, a federal "agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quotation marks omitted).  Where, as here, an agency changes its position, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  In the 2022 Final Rule, DHS acknowledged that it was changing its policy and provided a reasoned justification for that change, which: (i) appropriately considered the 2019 Rule's chilling effects; (ii) rationally reviewed evidence of the 2019 Rule's real-world impacts on a range individuals and entities, including States; and (iii) weighed those impacts against a relative lack of evidence of the 2019 Rule's purported benefits.

### A.  Defendants Appropriately Considered Chilling Effects

When promulgating the 2022 Final Rule, DHS properly took "into account the chilling effects historically associated with the public charge ground of inadmissibility."  87 Fed. Reg. at 55,491 (citing 87 Fed. Reg. at 10,587-92 (Feb. 24, 2022)).  DHS surveyed evidence of "the widespread collateral effects of the 2019 Final Rule, including loss of nutrition and medical assistance by, for instance, U.S. citizen children in mixed-status households."  87 Fed. Reg. at 55,505.  These predictable harms had been a matter of concern for decades, and it was no surprise that they arose from the 2019 Rule.  Legally present immigrants, such as refugees and U.S. citizen children, who were otherwise eligible for federal public benefits, avoided or

11

withdrew from those programs out of fear that they or their loved ones would suffer adverse immigration consequences.[6]  *See supra* at 7.

Plaintiff asserts that federal law prohibits DHS from even considering chilling effects on U.S. citizens' and legal permanent residents' participation in public programs.  *See* Mot. at 21. But that argument lacks any grounding in the INA or APA, and was not endorsed by any of the courts that addressed the public charge statute.  Indeed, the 2019 Rule itself discussed chilling effects and their consequences, and "made a number of changes in the [2019] final rule" to "mitigate some of the concerns raised by the public regarding disenrollment impacts," such as excluding Medicare Part D and the Children's Health Insurance Program (CHIP).  *See* 84 Fed. Reg. at 41,313.  The 2022 Final Rule likewise properly considered chilling effects and their consequences.

Furthermore, DHS reasonably concluded that supplemental benefits excluded by the 2022 Final Rule, including most healthcare and nutrition programs, help promote public health, employment, and self-sufficiency.  *See* 87 Fed. Reg. at 55,518.  Evidence from benefit-granting agencies as well as social-science literature demonstrates that the supplemental benefits targeted by the 2019 Rule, in particular Medicaid and SNAP, serve as temporary, supplemental assistance for many working individuals and families above the poverty line.[7]  In jurisdictions like many of the Amici States, which have expanded Medicaid eligibility to include a significant proportion of working-age adults, participation in Medicaid is a choice to enroll in an affordable public insurance option, not a sign of dependency.  Since 1996, Congress has continued to design

---

[6] Plaintiff's suggestion that the 2019 Rule's chilling effects are limited to "aliens" (Mot. at 22) is wrong.  The 2019 Rule's impacts encompassed U.S. citizens in mixed-status households, 87 Fed. Reg. at 55,505, who are not "aliens" under immigration law.

[7] *See, e.g.*, Public Health Scholars Comment (Apr. 25, 2022), p. 6.

Medicaid and other programs for the purpose of promoting self-sufficiency, not dependency. *See, e.g.*, Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. No. 106-170, § 201, 113 Stat. 1860, 1891-94 (expanding state authority to offer Medicaid to individuals with disabilities with incomes far above poverty line).

### B.    The 2019 Rule's Serious Harms Support the 2022 Final Rule

Plaintiff further asserts that the 2022 Final Rule is arbitrary and capricious because DHS purportedly failed to provide a "reasoned justification for its significant departures from the previous [2019] Rule."  Mot. at 2.  But DHS clearly articulated its reasons, supported by the administrative record, for returning to its longstanding public charge interpretation.  DHS considered "a range of downstream consequences for the general public and for State and local governments" due to chilling effects, such as "avoidance of preventive medical care, children's immunizations, and nutrition programs."  87 Fed. Reg. at 55,529.  DHS reasonably took into consideration "the impacts of the 2019 Final Rule on families, communities, States, and localities that suffered economically due to reduction in food security, adverse impacts on public health, and increase in uncompensated medical care."  *Id.*  Plaintiff does not dispute DHS's statement that all of these harms were "well-documented" in the administrative record.  *Id.* at 55,508.

For example, immigrant families' decreased participation in public healthcare benefits causes harms both immediate and far-reaching.  The 2019 Rule (and a prior leaked draft) led to a nationwide decrease of 260,000 fewer children enrolled in Medicaid, including an 8% drop in U.S. citizen children, and even more substantial drops in participation in nutrition and other child welfare programs.[8]  The administrative record demonstrates that participation in such programs

---

[8] 87 Fed. Reg. at 55,504; Amici States Comment (Apr. 25, 2022), pp. 10-12.

has demonstrably positive benefits, for individual enrollees and for society at large.[9]  In the experience of Amici States, not only do immigrants benefit from better health and nutrition when temporary, supplemental support is available, our Nation as a whole benefits from their thriving.

Specifically, access to primary and preventive care, which was reduced by the 2019 Rule, helps promote individual wellbeing as well as population health.  Those without a primary care doctor are less likely to access vaccinations or other preventive health services, making public health responses to infectious diseases more difficult.[10]  When promulgating the 2019 Rule, the prior federal administration acknowledged that disenrollment in benefit programs could lead to "[i]ncreased prevalence of communicable diseases," 83 Fed. Reg. at 51,270, but failed to connect this acknowledgment of risk with any real world costs or other harms.  Through its new rulemaking process, DHS gathered substantial feedback about those harms, showing, for example, how lack of access to health insurance like Medicaid reduced the likelihood of individuals receiving early testing or treatment for COVID-19 and impeded public health efforts to combat the disease.[11]

DHS also reasonably considered broader societal harms caused by decreased enrollment in supplemental nutritional programs.  Immigrant parents reported that they stopped using SNAP or other food programs between 2018 and 2020 due to immigration-related concerns, a pattern echoed by nutrition service providers.  87 Fed. Reg. at 55,504-05.  This finding is consistent with the experience of Amici States.  *See supra* at 7.

---

[9] *See, e.g.*, Public Health Scholars Comment (Apr. 25, 2022), p. 9.

[10] *See, e.g.*, AHIP Comment (Oct. 22, 2021).

[11] *See, e.g.*, Amici States Comment (Apr. 25, 2022), p. 14.

14

These trends have serious, real-world consequences.  For example, immigrant mothers who participated in prenatal WIC have lower risk of low birthweight compared to those who do not participate.  "[I]nfant birthweight, in turn, is an important 'predictor of children's future health and development,' with low birthweight resulting in longer hospitalizations, higher perinatal healthcare costs, and 'increased risk for mortality and morbidity, including developmental delays, cerebral palsy, blindness, deafness, and hydrocephaly,' and 'multiple chronic adult medical conditions' that lead to 'high educational and health costs over time,' including increased Medicaid spending."[12]  "In a nation where one out of every four infants is born to an immigrant parent,"[13] these consequences matter deeply.

Chilling effects also led to increased administrative costs for Amici States, another factor DHS properly considered in the 2022 Final Rule.  *See* 87 Fed. Reg. at 55,508, 55,579.  The 2019 Rule increased operational costs for programs like school lunch and WIC, [14] even though they were not included in the 2019 Rule.  Amici States' benefit-granting agencies report that because the formula in the 2019 Rule was so complex and layered, even service providers found it extraordinarily difficult to understand whether or how it applied.[15]  And States, the insurers of last resort, ultimately bear part of the burden when individuals forgo preventive care and

---

[12] Amici States Comment (Apr. 25, 2022), pp. 18-19 (quoting Stephanie Ettinger de Cuba, et al., *Prenatal WIC Is Associated with Increased Birth Weight of Infants Born in the United States with Immigrant Mothers*, J. of the Academy of Nutrition and Dietetics, at 1 (Feb. 2022)); Children's HealthWatch Comment (Oct. 22, 2021).

[13] Amici States Comment (Apr. 25, 2022), p. 19.

[14] School Nutrition Association Comment (Apr. 25, 2022).

[15] *See, e.g.,* Amici States Comment (Apr. 25, 2022), pp. 21-22; Latino Community Asset Builders Comment (Apr. 25, 2022), p. 3.

insurance coverage and instead rely on more costly, uncompensated emergency care.[16]
Consideration of these impacts in the 2022 Final Rule by DHS was manifestly reasonable.

### C.    DHS Appropriately Determined that the 2019 Rule's Purported Benefits Did Not Outweigh Its Harms

Finally, the chilling effects caused by the 2019 Rule and their harmful consequences were grossly disproportionate to its benefits (if any).

As DHS explains, although the 2019 Rule was costly and time consuming to implement, it had virtually no impact on actual public charge adjudications and resulted in no sustained new public charge determinations. 87 Fed. Reg. at 55,492. In highlighting costs incurred as a result of its so-called reliance interest, Plaintiff refers broadly to the "billions of dollars Texas spends to provide Medicaid benefits to low-income individuals." Mot. at 22. But Plaintiff fails to explain how it would be reasonable to attribute Texas's entire Medicaid budget as a potential "cost" of the 2022 Final Rule. Unlike most Amici States, Plaintiff has not expanded its Medicaid program to cover working-age individuals, so even fewer immigrants are eligible for Medicaid enrollment in the first place. And Texas's purported increased Medicaid costs are "attributable to a very significant extent to confusion and uncertainty," 87 Fed. Reg. at 55,529, and not to savings resulting from denials of admission of noncitizens. While Texas does offer some Medicaid programs that provide coverage to noncitizens, *see Texas v. Biden*, 589 F. Supp. 3d 595, 611 (N.D. Tex. 2022), these programs would have been subject to an exclusion under the 2019 Rule, *see* 84 Fed. Reg. at 41,501 (excluding emergency Medicaid and Medicaid for noncitizens under the age of 21). Finally, Plaintiff's argument that its overall state Medicaid budget should have

---

[16] National Association of Community Health Centers Comment (Oct. 22, 2021).

been considered as a reliance factor fails to account for the overall fiscal benefits of avoiding chilling effects in the Medicaid program, described by Amici States on page 15, *supra*.

## CONCLUSION

The Court should deny Plaintiff's motion for summary judgment, and grant Defendants' cross-motions.


Dated:  October 27, 2023                          Respectfully submitted,


LETITIA JAMES                                     ROB BONTA
Attorney General of New York                      Attorney General of California
BARBARA D. UNDERWOOD                              RENU R. GEORGE
Solicitor General                                 Senior Assistant Attorney General
JUDITH N. VALE                                    KATHLEEN BOERGERS
Deputy Solicitor General                          Supervising Deputy Attorney General
STEPHEN J. YANNI
Assistant Solicitor General
                                                  */s/Anna Rich*
*Attorneys for State of New York*                 ANNA RICH
                                                  Deputy Attorney General
                                                  Attorney-in-Charge
                                                  California Bar No. 230195
                                                  Appearing *pro hac vice*

                                                  1515 Clay St., 20th Floor
                                                  Oakland, CA 94612
                                                  (510) 879-0296
                                                  anna.rich@doj.ca.gov
                                                  *Attorneys for State of California*




PHILIP J. WEISER                                  KATHLEEN JENNINGS
*Attorney General*                                *Attorney General*
*State of Colorado*                               *State of Delaware*

WILLIAM TONG                                      ANNE E. LOPEZ
*Attorney General*                                *Attorney General*
*State of Connecticut*                            *State of Hawaii*

17

KWAME RAOUL
*Attorney General*
*State of Illinois*

AARON M. FREY
*Attorney General*
*State of Maine*

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*

DANA NESSEL
*Attorney General*
*State of Michigan*

KEITH ELLISON
*Attorney General*
*State of Minnesota*

AARON D. FORD
*Attorney General*
*State of Nevada*

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*

ROBERT FERGUSON
*Attorney General*
*State of Washington*

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*

**CERTIFICATE OF WORD COUNT**

Pursuant to Court Procedure 16(c), I hereby certify that, according to the word count feature of the word processing program used to prepare this document, the document contains 4,998 words and otherwise complies with the Court's formatting requirements.

/s/ *Anna Rich*
Anna Rich
Deputy Attorney General