**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION No. 6:23-CV-00001 |
| | § | |
| ALEJANDRO MAYORKAS, et al., | § | |
| *Defendants.* | § | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Texas has standing. It is entitled to special solicitude because public charge determinations involve quasi-sovereign interest. Texas, moreover, is injured by the repeal of the 2019 Rule and the adoption of the 2022 Rule, both due to the increased number of aliens admitted and the number of aliens who would otherwise have foregone or disenrolled from public benefits, including in-kind benefits. These harms are fairly traceable to the adoption of these rules and would be redressed through their vacatur.

The repeal of the 2019 Rule violated the APA. Defendants lacked good cause for avoiding the notice-and-comment process required to repeal the 2019 Rule. Defendants' failure to go through notice-and-comment was not harmless error. It deprived Texas of the opportunity to participate meaningfully in the repeal process.

The 2022 Rule was adopted in violation of the APA. Defendants adopted a definition of public charges at odds with Congress's intent, without considering in-kind public benefits, and without meaningfully assessing the accuracy of the affidavits of support. The 2022 Rule, moreover, is arbitrary and capricious because it failed to consider the financial impact on Texas and did not provide a reasoned justification for the departure from the 2019 Rule.

The requested relief, vacatur, is appropriate and cannot be limited to Texas because of the constitutional command for uniform immigration laws.

This Court should vacate the 2022 Rule and the illegal repeal of the 2019 Rule.

## REPLY AND RESPONSE

I.     **Standing.**

      A.     **Texas is entitled to special solicitude.**

Defendants wrongly contend that Texas is not entitled to special solicitude because it has no quasi-sovereign interests in this suit. Dkt. 47 at 23. "Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022) ("*DACA*") (citing *Texas v. United States*, 809 F.3d 134, 151-52 (5th Cir. 2015) ("*DAPA*")). Quasi-sovereign interests are "not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 602 (1982). Rather, they "consist of a set of interests that the State has in the well-being of its populace." *Id*. These include interests in "the health and well-being—both physical and economic—of its residents" and in "not being discriminatorily denied its rightful status in the federal system." *Id*. at 607.

The Fifth Circuit has already held that "[t]he importance of immigration policy and its consequences to Texas, coupled with the restraints on Texas' power to make it, create a quasi-sovereign interest." *DACA*, 50 F.4th at 516. The same analysis applies to public charge determinations. The 2022 Rule will have a major effect on Texas's fisc, causing billions of dollars in losses to the State from the administration and distribution of benefits to those who would otherwise disenroll or forego enrollment. Dkt. 40-1. Texas must bear these costs, while simultaneously being unable to legislatively distinguish among those classes of impacted public beneficiaries without running afoul of federal preemption or the Equal Protection Clause. *See DAPA*, 809 F.3d at 153. That should end the Court's analysis. Defendants do not even attempt to

grapple with these rulings; instead, they repeat the same argument that the Fifth Circuit rejected in *DAPA* and *DACA*, that immigration policies do not implicate quasi-sovereign interests. Dkt. 47 at 23. This Court should reject this argument for the same reasons the Fifth Circuit did in *DACA* and *DAPA* and find that Texas is entitled to special solicitude. *See also Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021) ("*MPP*"), *rev'd and remanded on other grounds*, 142 S. Ct. 2528 (2022).

Defendants also purport to rely on *United States v. Texas*, 143 S. Ct. 1964, 1975 n.6 (2023) ("*Enforcement Priorities*"), for the contention that "special solicitude is inappropriate in a case like this one." Dkt. 47 at 22. But *Enforcement Priorities* said ***nothing*** about special solicitude—a fact that was very pointedly noted in the concurrence. 143 S. Ct. at 1977 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) ("Even so, it's hard not to wonder why the Court says nothing about 'special solicitude' in this case.").

### B. Texas has suffered a concrete and particularized injury that is fairly traceable to Defendants' actions and that will be redressed by a favorable decision.

Texas meets every element of standing because it has suffered "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *DAPA*, 809 F.3d at 150 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).

#### 1. Texas has suffered an injury in fact.

Defendants respond that Texas lacks standing because it's alleged injuries are indirect, disenrollment and foregone enrollment are not harms, and there is no evidence of harm to Texas. Dkt. 47 at 10-19. None of these arguments has any basis in law or fact.

The evidence, instead, shows that Texas has experienced an injury-in-fact in the form of (1) the costs to the state from aliens who have been or will be admitted under the 2022 Rule and

(2) the savings to Texas from aliens choosing to disenrolling or foregoing enrollment in public benefits because of the 2019 Rule. *See* Dkt. 40-1 (Texas' Motion for Summary Judgment Appendix).

### i.   *Enforcement Priorities* supports Texas' assertion of standing.

Defendants primarily rely on *Enforcement Priorities* for their contention that Texas has not experienced an injury. Dkt. 47 at 12 (Defendants claiming that Texas is leading the Court down a "forbidden road."). But the decision is inapt, and to the extent it does apply, is *supports* the contention that Texas has standing.

*Enforcement Priorities* involved Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Id.* at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id.* The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). This holding was based solely on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* Indeed, the Court held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's

traditional discretion over whether to take enforcement actions against violators of federal law." *Id*. at 1975.

This case is obviously distinguishable from *Enforcement Priorities*. It involves neither arrests nor prosecutions, but Defendants statutory obligation not to admit aliens likely to become public charges.

Nonetheless, even if this Court did find *Enforcement Priorities* applicable, Texas still have standing. In *Enforcement Priorities*, the Supreme Court found that "[i]n holding that Texas and Louisiana lack standing, we do not suggest that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." 143 S. Ct. at 1973. The Supreme Court proceeded to give several examples where States *would* have standing to challenge federal arrest and prosecution policies, of which at least two are at-issue in this suit. *Id.*

*First*, Texas has standing because this suit involves a challenge to the provision of legal benefits or status. The Supreme Court held in *Enforcement Priorities* that "... a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities **and** the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis." *Id*. at 1973 (emphasis in original) (citing *Department of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); *DAPA*, 809 F.3d at 154 (5th Cir. 2015) (nonprosecution is distinct from benefits)). There is no dispute that Texas is challenging the provision of legal benefits or status in this suit; consequently, Texas has standing because it is subject to one of the

enumerated exceptions in *Enforcement Priorities*. *See Texas v. United States*, No. 1:18-CV-00068, 2023 WL 5951196, at *9 (S.D. Tex. Sept. 13, 2023) (rejecting the same *Enforcement Priorities* arguments raised by Defendants and holding that Texas has standing to challenge in a suit that involves "non-prosecution with benefits").

*Second*, Texas has standing because it contends that Defendants have abdicated their statutory responsibilities to screen and exclude public charges. The Supreme Court in *Enforcement Priorities* held that a state would have standing if an agency "consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." 143 S. Ct. at 1973–74 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). This is precisely what is at issue in this suit. Texas contends that Defendants have abdicated their statutory responsibility to screen and exclude aliens likely to become public charges. Thus, Texas independently meets a second enumerated exception to the holding in *Enforcement Priorities*.

This Court should, accordingly, find that *Enforcement Priorities* is inapplicable, and to the extent it is applicable, it supports Texas' contention that it has standing.

### ii.     The 2022 Rule's monetary harm to Texas is well-supported.

The Supreme Court has found standing for states challenging a citizenship question on the U.S. census when the states alleged that the question would result in undercounting of their population, which would correspondingly result in the loss of federal funds. *Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019).

*Enforcement Priorities* did not change this. Defendants, in *Enforcement Priorities*, spent six pages of their brief arguing that indirect monetary harms were not cognizable. Brief for Petitioners,

*United States v. Texas*, no. 22-58, at 11–17.[1] The Supreme Court barely acknowledged Defendants'
argument—devoting a few sentences of dicta addressing it in a footnote. 143 S. Ct. at 1972 n.3.
And, importantly, Defendants cannot point to any subsequent rulings in the Fifth Circuit where
Courts have found that Texas lacks standing to challenge rules under the APA because it will only
"indirectly" cost the state *billions* of dollars.

The 2022 Rule will *necessarily* have a significant impact on Texas' public fisc. Texas is the
second largest state, both in geographic size and population. It spends approximately $30.8 billion
annually distributing and administering public benefits to Texans. Dkt. 1 ¶60-62. Medicaid alone
accounts for approximately 28% of Texas's annual budget. *Id*. at ¶62. The average Medicaid
beneficiary costs Texas more than $9,000 annually. *Id*. at ¶48.

Defendants claim that Texas lacks standing because it cannot identify anyone who was
admitted under the 2022 Rule who would have been excluded under the 2019 Rule. Dkt. 47 at 12-
14. First, this argument does not account for the number of individuals who were *denied entry* based
on public charge determinations. Second, the denied applications number is not representative
because the 2019 Rule was only briefly in effect due to court-imposed stays. Third, and most
importantly, applicants who *would have* been denied on public charge grounds likely chose not to
apply for a change in status in the first place because they could use the objective criteria contained
in the 2019 Rule to determine that their applications would be denied. In other words, the best
measure for the number of individuals who likely would have been denied a change in immigration
status on public charge grounds under the 2019 Rule is the overall change in the number of

---

[1] https://www.supremecourt.gov/DocketPDF/22/22-58/237711/20220912201922622_22-58tsUnitedStates.pdf

applicants before and after Defendants proposed the 2019 Rule on October 10, 2018, as reflected below:

| Table 8. Total Population that Applied for Adjustment of Status, FY 2014 to FY 2021. | |
|---|---|
| **Fiscal Year** | **Total Population Applying for Adjustment of Status** |
| 2014 | 637,138 |
| 2015 | 638,018 |
| 2016 | 711,431 |
| 2017 | 763,192 |
| 2018 | 704,407 |
| 2019 | 600,079 |
| 2020 | 577,920 |
| 2021 | 726,566 |
| **Total (FY 2014 – FY 2018)** | **3,454,186** |
| **5-year average (FY 2014 – FY 2018)** | **690,837** |
| Source: USCIS analysis of data provided by USCIS, Policy and Research Division (Jan. 10, 2022) | |

87 Fed. Reg. 55,602.

Defendants' own data shows an 18% drop in the number of applicants seeking to change their status between fiscal year 2018 and 2020. This decline in applications, even accounting for the pandemic in the latter half of fiscal year 2020, is directly attributable in whole or part to the 2019 Rule. 87 Fed. Reg. 55,505. Defendants fails to address this measurable and significant change because they cannot.

The Fifth Circuit has rejected arguments like Defendants, Dkt. 47 at 18-20, that Texas must provide highly specific individualized evidence when challenging large-scare policies. *See MPP*, 20 F.4th at 971 ("MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence.").

In addition to the data in the 2019 and 2022Rules, Texas has produced ample evidence showing harm.

*First*, Texas is harmed because more aliens in Texas means that it will have to correspondingly expend public funds issuing additional driver's licenses. Dkt. 40-1 at App'x 1-4 (Gibson Affidavit). If an alien presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document, parole, or grant of deferred action) and otherwise meets eligibility requirements, DPS will issue a limited-term driver license or personal identification certificate to a non-citizen resident of Texas. *Id.* ¶ 5. To date, in fiscal year 2023 (September 2022 through July 2023), DPS issued 436,205 limited-term licenses and identification certificates. In fiscal year 2022 (September 2021 through August 2022), DPS issued 414,567 limited-term licenses and identification certificates. *Id.* For each non-United States citizen resident of Texas who seeks a limited-term driver license, the State spends $.0.05 verifying their social security information, with an additional $0.028 spent for those seeking a commercial drives license. *Id.* at ¶¶6-7. Each additional customer seeking a limited-term driver license or personal identification certificate imposes a cost on DPS exceeding $33. *Id.* ¶ 8. Furthermore, DPS estimates that for an additional 10,000 driver license customers seeking a limited-term license, DPS would incur a biennial cost of approximately $3,681,692. *Id.* For every 10,000 additional customers above the 10,000-customer threshold, DPS may have to open additional driver license offices or expand current facilities to meet that increase in customer demand. *Id.* "The added customer base that may be created by an increase in the number of individuals authorized to be in the United States who chose to reside in Texas will substantially burden driver license resources without additional funding and support." *Id.* at ¶ 10.

*Second*, more aliens in Texas means more costs to the state for their incarceration. Dkt. 40-1 at App'x 5-7 (Waltz Affidavit). According to the most recently available data, the average cost of incarcerating an inmate who qualifies for reimbursement under the federal government's State Criminal Alien Assistance Program ("SCAAP") in Texas Department of Criminal Justice ("TDCJ") facilities was $77.49 per day from July 1, 2021 to June 30, 2022. *Id*. ¶6. During that period, TDCJ incarcerated 6,914 eligible inmates for a total of 2,019,635 days. The total cost of incarcerating these inmates for that period was $156,501,516. The SCAAP program has not reimbursed those costs. *Id*. ¶ 8. To the extent that the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well. *Id*. ¶9. TDCJ also incurs costs to keep aliens in custody or add them to mandatory parole or supervision programs when those aliens are not detained or removed by federal immigration authorities. *Id*. ¶10. For Fiscal Year 2022, the average per-day cost of these programs for each inmate not detained or removed is $4.69, which would total $9,307,760, based on the number of inmates for the most recently completed SCAAP application. *Id*. In sum, "[w]hether incarcerating criminal aliens or having them on parole or mandatory supervision, TDCJ incurs costs." *Id*. at ¶10.

*Third*, Texas is also harmed because more aliens in Texas means more alien students enrolled in Texas schools, including more unaccompanied alien children (UAC). Dkt. 40-1 App'x 8-9 (Meyer Affidavit). The estimated average per-student, per-year funding entitlement for a student in Texas public schools in Fiscal Year 2023 will be $9,564. *Id*. at ¶ 2. For a student who qualifies for Bilingual and Compensatory Education weighted funding, that amount is $11,781. *Id*. While Texas does not have information on the total number of alien children attending public schools in the State, there is available data for a subset of those children—unaccompanied alien

children (UAC). *Id*. ¶ 3–4. UAC are likely to qualify for Bilingual and Compensatory Education weighted funding, making their per-student, per-year costs $11,781. *Id*. ¶ 2. Data from the U.S. Health and Human Services Office of Refugee Resettlement indicates that in Texas, immediately prior to the 2019 Rule taking effect, 9,900 UAC were released to sponsors. *Id*. at ¶3. The number of UAC released to sponsors dropped to 2,336 (a 76% decrease) when the 2019 Rule was adopted. *Id*. **The number of UAC released to sponsors jumped to 15,341 (a 556% increase) during the period the 2019 Rule was stayed and repealed; and jumped to 19,071 (a 716% increase) after the 2022 Rule was proposed and adopted.** *Id*. The estimated annual cost to educate these children immediately prior to the 2019 Rule was $53.05 million. *Id*. at ¶4. While the 2019 Rule was in effect the estimated cost dropped to $42.73 million (a 19% decrease). *Id*. **The estimated annual costs to educated these children have ballooned since the adoption of the 2022 Rule to $224.67 million (a 425% increase).** *Id*. These estimates do not include any potential costs associated with UAC continuing in Texas public schools beyond one year. *Id*. ¶¶ 3–4. And, while UAC may not be subject to public charge determinations, their numbers are indicative of the financial burden of aliens on Texas. Every additional alien child enrolled in Texas public schools would increase the State's cost that would otherwise have been spent on other state priorities. *Id*. at ¶¶ 5–7.

*Fourth*, more aliens in Texas also means more expenditures on public benefits, particularly the kind of in-kind benefits that were the subject of the 2019 Rule. Dkt. 40-1 at App'x 10-21 (Bricker Affidavit). HHSC provides three principal categories of services and benefits to illegal aliens in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage ("CHIP Perinate"). *Id*. ¶ 5. Illegal aliens also receive uncompensated medical care from public hospitals in the State. *Id*.

**HHSC estimates the portion of Emergency Medicaid payments attributable to illegal aliens in Texas prior to the 2019 Rule as $116 million, when the 2019 Rule was adopted the cost dropped to $88.3 million, and then increased with the stay and purported repeal of the 2019 Rule to $95.6 million.**[2] *Id.* at ¶9. **HHSC further estimates the number of illegal aliens served by CHIP as rising from $11.1 million in 2019 to $30.9 million in 2022 (a 178% increase**). *Id.* at ¶11. Although all of these cost estimates include some margin of uncertainty, it is clear that both of these programs have some positive cost to the State of Texas due to utilization by aliens, including illegal aliens. *Id.* ¶ 13. These are in-kind benefits whose fluctuation is directly attributable to the 2019 and 2022 Rules.

The 2022 Rule concluded that it would cause 3.1% in disenrollment or foregone enrollment in public benefits, with an annual savings of over $1.6 billion to the states. 87 Fed. Reg. 55,621, 55,631. This was the *most conservative* estimate. *Id.* at 55,621. As discussed *supra*, Texas saw a significantly greater increase than 3.1%. Dkt. 40-1 at App'x 10-21. A host of studies between 2016 and 2020 estimated implementation of the 2019 Rule would result in disenrollment or foregone enrollment rates ranging from 4.1% to as high as 48%. *Id.* Defendants ultimately settled on using 3.1% on the low end and 14.7% on the high end for their fiscal analysis. 87 Fed. Reg. 55,631. Defendants estimate that the states will save $6.25 billion annually using the 14.7% rate. *Id.* These savings will necessarily have a significantly impact Texas because it has more alien residents than any other state—save California.

Defendants cannot deny that a predictable consequence of the 2019 and 2022 Rules will be a corresponding increase in the number of admitted aliens receiving public benefits; which will

---

[2]   HHSC only has partial data for the period when the 2022 Rule was adopted. Dkt. 40-1 at App'x 12, ¶9 n.1.

necessarily impact Texas' public fisc. *See Cook Cnty., Illinois v. Mayorkas*, 340 F.R.D. 35, 42 (N.D. Ill. 2021), *aff'd sub nom. Cook Cnty., Illinois v. Tex.*, 37 F.4th 1335 (7th Cir. 2022), *cert. denied sub nom. Tex. v. Cook Cnty.*, 143 S. Ct. 565 (2023) ("DHS admits that, without the [2019] Rule, some number of additional noncitizens will become eligible for public benefits by achieving lawful permanent resident status. A predictable consequence of that eligibility is that those noncitizens will obtain public benefits.").

Finally, ss noted above, the Welfare Reform Act "restrict[s] most noncitizens from eligibility for many federal and state public benefits. It grants lawful permanent residents access to means-tested public benefits only after they have spent five years as a lawful permanent resident [although there are many exceptions allowing immediate benefits]." *Cook Cnty.*, 962 F.3d at 225 (citing 8 U.S.C.§§ 1611, 1613, 1621). More aliens admitted means more aliens will receive benefits from Texas five years after they are admitted.

In sum, Defendants own data analyses and Texas' four affidavits, show that Texas has standing because it has experienced an injury-in-fact.

### iii. Disenrollment and foregone enrollment in public benefits are harms.

Defendants, wrongly, argue that Texas cannot show that disenrollment or foregone enrollment are harms sufficient to show standing, which they insultingly characterize as "Texas' purported interest in confusing its residents who are not subject to the public charge rule…." *Id.* at 14-16.

First, Defendants have not and cannot cite to anywhere in the 2022 Rule where it concluded that *only* those who were *not* subject to public charge determinations would choose to disenroll or forego enrollment in public benefits. *Id.* The 2022 Rule concedes that when it uses the

term "chilling effects" it refers to the decision to disenroll or forego enrollment in public benefits—regardless of the reason or whether the individual is subject to public charge determinations. 87 FR 55,473 n.9. And the 2022 Rule repeatedly acknowledges that some of those disenrolling or foregoing enrollment *would be* subject to public charge determinations. *See e.g., id*. at 55,467. This squarely puts them within the public charge "zone of interest" that Congress intended to regulate.

Second, the 2019 Rule, instead of causing confusion, provided *clarity* by defining a public charge as any alien (with some exceptions) who receives certain cash and in-kind government benefits for more than 12-months in the aggregate in a 36-month period. 84 Fed. Reg. 41,508. Aliens who could afford to do so correspondingly chose to disenroll or forego enrollment in public benefits to avoid exclusion under the 2019 Rule. Defendants mischaracterize these rational, calculated decisions as "confusion," "fear," and "chilling effects." Dkt. 47 at 14-15.

In any event, theories of injury to state public fisc predicated on the actions of the federal government's immigration policies are well-established. *See, e.g., Clinton v. City of N.Y.*, 524 U.S. 417, 430–31, 118 S.Ct. 2091, 2099, 141 L.Ed.2d 393 (1998) (finding sufficient for standing purposes a local government's claim to suffering injury to its "borrowing power, financial strength, and fiscal planning"); *DAPA*, 809 F.3d at 152–53 (finding sufficient for standing purposes several states' claims to suffering injury to their public fiscs); *see also Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 261–62 (6th Cir. 2009). And such financial harm is particularly acute in the context of federal immigration enforcement, where states have "an interest in mitigating the potentially harsh economic effects of sudden shifts in population." *Plyler v. Doe*, 457 U.S. 202, 228, (1982); *see also Arizona v. United States*, 567 U.S. 387, 397 (2012) (acknowledging states "bear[ ]

many of the consequences of unlawful immigration"). *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S.Ct. 2271 (2016) (mem.).

### 2. Traceability

Defendants argue that Texas cannot show that its alleged injuries are fairly traceable to the repeal of the 2019 Rule and adoption of the 2022 Rule because these injuries are dependent on the actions of independent third parties who may or may not apply for public benefits. Dkt. 47 at 19-20. But Defendants, in the 2022 Rule, concluded that there was a *causal connection* between the 2019 Rule and individuals disenrolling or foregoing enrollment in public benefits. *See, e.g.*, 87 Fed. Reg. 55,505. Defendants found the relationship between the 2019 Rule and disenrollment and foregone enrollment so compelling that it warranted changing national immigration policy through the adoption of the 2022 Rule. *Id.* at 55,579 ("This public charge rule intends to administer the statute faithfully and fairly, while avoiding predictable adverse and indirect consequences such as disenrollment or forgone enrollment by individuals who would not be subject to the public charge ground of inadmissibility in any event.").

Yet, here, Defendants deny the existence of this causal connection because this relationship "depends upon the decision of an independent third party." Dkt. 47 at 19-20. Texas, in rebuttal, offers Defendants own analyses of the 2019 and 2022 Rules, which found that the 2019 Rule would result in increased disenrollment and individuals foregoing public benefits, 87 Fed. Reg. 55,621, 631, and found an 18% decline in applicants seeking to change their status following announcement of the 2019 Rule (because they believed they would have been excluded on public charge grounds). *Id.* at 55,602.

### 3. Redressability

Defendants claim that a favorable ruling vacating the 2022 Rule would not redress Texas' alleged injuries because the 2019 Rule would still be vacated. Dkt. 47 at 20-22. In this, Defendants misrepresent through omission the history of the 2019 Rule. Dkt. 22 at 4 (citing *Cook Cnty., Illinois v. Wolf*, 498 F. Supp. 3d 999, 1004 (N.D. Ill. 2020)). The vacatur of the 2019 Rule was stayed by the Seventh Circuit. *Cook County v. Wolf*, No. 20-3150 (7th Cir. Nov. 19, 2020), ECF No. 21. The Supreme Court, meanwhile, granted review of a related challenge to the 2019 Rule. *Dep't of Homeland Sec. v. New York*, 141 S. Ct. 1370 (2021). "While obviously one can never fully predict how the Supreme Court is going to decide a case, the Supreme Court's earlier stays—combined with its later cert grant of a lower court decision at odds with those stays—did not bode well for opponents of the rule." *City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 992 F.3d 742, 747 (9th Cir.) (VanDyke, J., dissenting), *cert. granted in part sub nom. Arizona v. City & Cnty. of San Francisco*, 142 S. Ct. 417 (2021), *and cert. dismissed as improvidently granted sub nom. Arizona v. City & Cnty. of San Francisco, California*, 142 S. Ct. 1926 (2022). Suddenly, Defendants found themselves "in the awkward position of having a case teed up before the Supreme Court that it knew it was likely to win, but now really wanted to lose. So in the early hours of March 9, 2021, despite the Supreme Court having granted certiorari just two weeks prior in a related case… DHS in coordination with the plaintiffs moved to dismiss the Seventh Circuit appeal of the district court's vacatur of the rule." *Id*. The same day the Seventh Circuit granted the dismissal and issued the mandate. *Id*. Four days later Defendants issued a final rule without notice and comment or a delayed effective date repealing the 2019 Rule, alleging that they were merely promulgating a rule

that was already in effect due to the vacatur. 86 Fed. Reg. 14,221. This is the repeal of the 2019 Rule challenged by Texas.

Defendants' redressability argument ignores the fact that Texas is challenging both the adoption of the 2022 *and* the repeal of the 2019 Rule.  Dkt. 1 ¶¶66-79. It is also incorrect because it assumes, wrongly, that vacatur of the 2019 Rule reinstates the 1999 field guidance that the former had replaced. Dkt. 22 at 11. The 2019 Rule explicitly superseded the field guidance. 84 Fed. Reg. 41,292 ("This final rule supersedes the 1999 Interim Field Guidance on Deportability and Inadmissibility on Public Charge Grounds."). Just as the "repeal or expiration of a repealing statue does not reinstate the original statute," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 334-35 (2012) (explaining the "Repeal-of-Repealer Canon"), the vacatur of the 2019 Rule did not reinstate the superseded field guidance. It is immaterial that Texas is not challenging the 2019 Field Guidance in this lawsuit.

A favorable ruling for Texas would reset the parties to March 9, 2021, and require Defendants to comply with the APA notice-and-comment process if they wish to repeal the 2019 Rule, and by requiring them to consider the savings to the states when adopting a new public charge rule. *See Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 432 (5th Cir. 2014) (the redressability requirement is satisfied if a favorable decision will relieve a discrete injury—plaintiffs need not show that a favorable decision will relieve *every* injury).

To the extent Defendants contend that Texas will experience no benefit from reinstatement of a vacated rule, this contention is belied by their own data showing a marked decrease in applicants seeking to change their status and increased disenrollment and foregone

enrollment both prior to the adoption of the 2019 Rule and while it was the subject of court-imposed stays.

## II.   The repeal of the 2019 Rule violated the APA and should be vacated.

Defendants cite to no legal authority in support of their contention that they were not required to go through the notice-and-comment process because the rule was vacated by a district court. Dkt. 47 at 39 (citing to *Howat v. State of Kansas*, 258 U.S. 181, 190 (1922), which *does not* say agencies can avoid notice-and-comment to repeal a rule vacated by a district court.).

The APA only excuses agencies from notice and comment "when the agency for good cause finds ... that [the] notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The burden of establishing good cause is on the agency. *Coal. for Workforce Innovation v. Walsh*, 2022 WL 1073346, at *5 (E.D. Tex. Mar. 14, 2022). "The APA's notice and comment exemptions must be narrowly construed." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (cleaned up).

The Fifth Circuit has held that the notice-and-comment exception only applies in situations where "delay would do real harm." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979). If, for example, "a safety investigation shows that a new safety rule must be put in place immediately" or if a rule was of "life-saving importance to mine workers in the event of a mine explosion," then notice and comment is not required. *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 93 (D.C. Cir. 2012) (citing *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004); *Util. Solid Waste Activities Grp. v. E.P.A.,* 236 F.3d 749, 755 (D.C. Cir. 2001); *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981)); *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:23-CV-59-JDK, 2023 WL 4977746, at *8 (E.D. Tex. Aug. 3, 2023).

Defendants did not have good cause for avoiding the notice-and-comment process. The so-called repeal of the 2019 Rule states that "[n]otice and comment and a delayed effective date are unnecessary for implementation of the court's order vacating the rule and would be impracticable and contrary to the public interest in light of the agency's immediate need to implement the now-effective final judgment." 86 FR 14,221. The Fifth Circuit has expressly rejected claims such as these—holding that inconvenience, the desire to eliminate uncertainty, and to provide immediate guidance are *not* good causes for avoiding notice-and-comment. *United States v. Johnson*, 632 F.3d 912, 929 (5th Cir. 2011).

Defendants cannot claim that vacatur of the 2019 Rule compelled them to repeal the 2019 Rule without going through the notice-and-comment process. The Fifth Circuit has held that "a vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the constitutional or statutory basis on which the court invalidated an agency action, vacatur *neither compels nor restrains further agency decision-making.*" *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (emphasis added). "[V]acatur does not order the defendant to do anything; it only removes the source of the defendant's authority." *See Nken v. Holder*, 556 U.S. 418, 428–29(2009) (citing *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023)). Defendants adopted the 2019 Rule through notice-and-comment, so they had to repeal it through notice-and-comment—even if the rule was vacated.

The good cause exception to notice-and-comment is interpreted narrowly to avoid providing agencies with exactly the type of escape clause invoked by Defendants in this case. *United States v. Garner*, 767 F.2d 104, 120 (5th Cir. 1985). Here, the 2019 Rule was the subject of conflicting rulings in multiple jurisdictions. Defendants, upon taking office, decided the easiest

way to repeal the 2019 Rule without having to go through the notice-and-comment process was to dismiss all pending appeals and adopt the one district court ruling vacating the rule. *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) ("Vacatur ... retroactively undoes or expunges a past state action....") (quoting *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021)). This was a transparent attempt at an end-run around the APA's rulemaking process and deprived the public of the ability to provide feedback prior to repealing the rule. If permitted, it will set a dangerous precedent allowing future administrations to intentionally avoid going through notice-and-comment to repeal controversial rules they disagree with that are the subject of litigation with conflicting rulings.

Defendants, moreover, cannot invoke the good cause exception because they failed to identify and explain how delaying notice-and-comment "would do real harm." *U.S. Steel Corp*, 595 F.2d at 214. Defendants seemingly *concede* they the only harm in delaying notice-and-comment was that it would be inconvenient for them, 86 FR 14,221, a contention that the Fifth Circuit has previously considered and rejected as *not* good cause, *Johnson*, 632 F.3d at 929.

Defendants' argument, in the alternative, that their failure to repeal the 2019 Rule through the notice-and-comment process was no more than harmless error, is similarly without merit. Dkt. 47 at 39. When an agency fails to provide notice and comment, courts must consider whether the error was harmless. *Johnson*, 632 F.3d at 930; *City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013). Determining whether an error was harmless is "a case-specific inquiry involving an estimation of the likelihood that the result would have been different." *Id.* (internal quotation marks omitted). "[T]he touchstone is 'whether it is clear that the lack of notice and comment did not prejudice the petitioner.'" *City of Arlington*, 668 F.3d at 244 (citing *Johnson*,

632 F.3d at 931). Courts should "rare[ly]" find harmless error. *Johnson*, 632 F.3d at 932. Here, Texas was harmed by the repeal of the 2019 Rule because it was deprived of the opportunity to express its vehement opposition to Defendants decision to no longer defend the 2019 Rule in Court and to the process through which Defendants went about repealing the 2019 Rule by cherry-picking a court ruling that it agreed with. Defendants knew that Texas had significant monetary interests that would be impacted by the repeal actions, but which it did not consider. Texas was unquestionably harmed by the repeal of the 2019 Rule and allowing it to later provide comment on the 2022 Rule did nothing to cure the harm caused by Defendants' earlier decision.

**III.    The 2022 Rule was adopted in violation of the APA and should be vacated.**

    **A.    The 2022 Rule lacks statutory authority.**

The 2022 Rule was adopted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), because Congress intended "public benefits" to mean "*any* retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit," *see* 8 U.S.C. §§ 1611(c)(1)(B), 1621(c)(1)(B) (emphasis added)).

Defendants attempt to weasel out of this straight-forward Congressional directive with arguments claiming, among other things, that modern dictionary definitions do not define the level of government support necessary to render a person a public charge. Dkt. 47 at 25.

Congress enacted the INA in 1952. "Public charge" should be given its broad ordinary meaning, as understood when the INA was enacted in 1952. *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 253 (4th Cir. 2020), *reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020) (citing *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995)). The ordinary meaning of "public charge" in 1952 was "one

who produces a money charge upon, or an expense to, the public for support and care." *Public Charge*, Black's Law Dictionary (4th ed. 1951) (defining as used in 1917 Immigration Act); Black's Law Dictionary (3d ed. 1933) (same); *see also* Arthur Cook et al., Immigration Laws of the United States § 285 (1929) (defining as person who needs "any maintenance, or financial assistance, rendered from public funds, or funds secured by taxation"). And "charge," in this context, meant a "cost" or "expense." *See, e.g., Charge*, The New Century Dictionary (2d ed. 1946); Webster's New Century Dictionary of the English Language (1941).

Similarly, the ordinary meaning of "public charge" means *any* degree of dependence on government assistance—not the primarily dependent definition adopted by Defendants. *See CASA de Maryland*, 971 F.3d 220 at 248; *See* Jane Perry Clark, *Deportation of Aliens from the United States to Europe* 110 (1931) ("The words 'public charge' mean a financial liability on, or expense to, the public for support and care."); Will Maslow, *Recasting Our Deportation Law: Proposals for Reform*, 56 Colum. L. Rev. 309, 340 (1956); Leo M. Alpert, *The Alien and the Public Charge Clauses*, 49 Yale L.J. 18, 23 (1939).

The 2019 Rule faithfully complied with Congress's intent by taking into consideration *both* cash and in-kind benefits, whereas the 2022 Rule did not and, instead, adopted a "primarily dependent" standard that does not consider so-called supplemental in-kind benefits.

Defendants are correct that the Fourth Circuits in *CASA de Maryland* held that the term "public charge" was broad enough to encompass both the definition used in the 2019 Rule and the "primarily dependent" definition in the 1999 Guidance (and later 2022 Rule). 971 F.3d at 244. Texas, however, contends that the Fourth Circuit Panel erred in reaching this decision and notes it is unknown how the Fourth Circuit would have ultimately ruled because Defendants dismissed

the case in bad-faith while it was pending rehearing en banc to avoid having to repeal the 2019 Rule through notice and comment.

Defendants reading of Justice Barrett's dissent is also wrong. Justice Barrett explicitly rejected the "primary dependence" definition used in the 1999 Guidance (and 2022 Rule) *and* its failure to consider supplemental in-kind benefits, in her opinion. *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 246 (7th Cir. 2020) (Barrett, J., dissenting). She noted that the in-kind benefits (like Medicaid, SNAP, and housing benefits) subject to the 2019 Rule were all means-tested, which was consistent with Congress's concept of self-sufficiency. She wrote:

> The affidavit provision reflects Congress's view that the term "public charge" *encompasses supplemental as well as primary dependence on public assistance*. To establish that a family-based applicant is not excludable as a public charge, a sponsor must promise to pay for the *noncitizen's use of any means-tested benefit* outside the itemized exclusions. Without such an affidavit, the noncitizen is inadmissible. Congress's attempt to aggressively protect the public fisc through the supporting-affidavit requirement is at odds with the view that it used the term "public charge" to refer exclusively to primary and permanent dependence.

*Id.* (emphasis added).

This Court should find that Defendants' refusal to consider in-kind benefits when making public charge determinations is without statutory authority.

It should similarly find that the 2022 Rule de-fangs § 1182(a)(4)(C)'s mandatory requirement by prohibiting a meaningful evaluation of whether the affidavit is true and correct. Defendants' contention that the 1999 Field Guidance did not require it to evaluate the accuracy of the affidavits prior to the 2019 Rule is irrelevant. Congress tasked Defendants with responsibility for regulating the process governing the affidavits of support, even if they are not tasked with enforcing violations. Defendants have abdicated their responsibility to meaningfully assess

whether aliens are likely to become public charges by refusing to assess the accuracy of the affidavits of support.

### B.      The 2022 Rule is arbitrary and capricious.

Defendants' arbitrary and capriciousness response contends that the "chilling effects" that the 2022 Rule sought to mitigate *only* applied to those who are not subject to public charge determinations. Dkt. 47 at 36-39. Defendants argue that "the 2022 Rule makes clear, the 'chilling effect' DHS was considering refers to the collateral effects of the 2019 Rule on people ***who are not*** subject to a public-charge inadmissibility determination (including U.S. citizens and others who have legal status and are eligible for the benefits). *Id.* (emphasis added).

This is Defendants' central argument for why the 2022 Rule is not arbitrary and capricious—and it is dead wrong. The 2022 Rule states that Defendants adopted it to "mitigate the possibility of widespread 'chilling effects' with respect to individuals disenrolling or declining to enroll themselves or family members in public benefits programs for which they are eligible, *especially with respect to individuals who are not subject to the public charge ground of inadmissibility.* 87 Fed. Reg. at 55,473. In other words, the 2022 Rule recognized that the so-called "chilling effects" did not apply ***only*** to those who were not subject to public charge determinations. *Id.* The footnote cited by Defendants similarly states that "[t]he term 'chilling effects' used throughout this rule is meant to convey the indirect effect of chilling an individual's participation in public benefit programs***, regardless of whether they are subject to the public charge ground of inadmissibility***, based on fear of negative immigration consequences. *Id.* at n.9 (emphasis added). The entire premise for Defendants' response, therefore, rests on a misunderstanding of the 2022 Rule. Dkt. 47 at 36-39, 1-16.  This Court should disregard Defendants' post-hoc rationalization that the 2022 Rule was adopted solely because of its collateral impacts on those *not* subject to public charge

determinations. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020).

The 2022 Rule's contention that disenrollment and foregone enrollment primarily impact aliens not subject to public charge determinations is only true when in-kind benefits are *not* factored in. *See e.g.,* 57 F.R. at 55,556-57 & ns.429-31 (citing Steven Camarota and Karen Zeigler, Center for Immigration Studies, "63% of Non-Citizen Households Access Welfare Programs," (Nov. 20, 2018), https://cis.org/Report/63-NonCitizen-Households-Access-Welfare-Programs (last visited Nov. 17, 2023). Studies show that aliens use public benefits at vastly higher rates than citizens when in-kind benefits are included in the definition of "welfare." *Id.* ("In 2014, 63 percent of households headed by a non-citizen reported that they used at least one welfare program, compared to 35 percent of native-headed households.").

> While most new legal immigrants (green card holders) are barred from most welfare programs, as are illegal immigrants and temporary visitors, these provisions have only a *modest impact* on non-citizen household use rates because: 1) most legal immigrants have been in the country long enough to qualify; 2) the bar does not apply to all programs, nor does it always apply to non-citizen children; 3) some states provide welfare to new immigrants on their own; and, most importantly, 4) non-citizens (including illegal immigrants) can receive benefits on behalf of their U.S.-born children who are awarded U.S. citizenship and full welfare eligibility at birth.

*Id.* (emphasis added).

Studies show that "[o]f households headed by non-citizens in the United States for fewer than 10 years, 50 percent use one or more welfare programs; for those here more than 10 years, the rate is 70 percent." *Id.* And, directly applicable to Defendants contention that in-kind benefits shouldn't be considered in public charge determinations because most recipients are employed, the study found "[o]f non-citizen households receiving welfare, *93 percent* have at least one worker...." *Id.* (emphasis added).

Defendants did not meaningfully address this data, nor did they consider the impact on the states of those individuals disenrolling or foregoing enrollment as a result of the 2019 Rule. They, instead, started and ended with the premise that public charge determinations *cannot* include in-kind benefits and that aliens disenrolling or foregoing enrollment was *necessarily* a bad thing (a contention that is directly at odds with Congress's welfare reform efforts).

Defendants' adoption of the 2022 Rule was also arbitrary and capricious because it failed to provide a reasoned justification for departure from the 2019 Rule. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 30, 42 (1983) (when an agency substantially alters a position, it must "supply a reasoned analysis for the change," and may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books."). The 2019 Rule set standards and objective metrics for making public charge determinations that were abandoned without explanation by the 2022 Rule. Take, for instance, the 12-month of public benefits analysis in the 2019 Rule. The 2019 Rule found that studies showed a substantial portion of individuals who receive public benefits did so for fewer than 12-months and that those who receive such benefits over a longer period were more likely to become "long-term recipients" of welfare. 84 FR 41,360. The 2022 Rule acknowledge this, but did not address it, instead finding that the possibility disenrollment and foregone enrollment in public benefits outweighed every other consideration. 87 FR 55,619.

## IV.     The Requested Relief is Proper.

Defendants contend that any relief should be limited to Texas. Dkt. 47 at 42-43. But the very case they cite for this proposition, *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021), affirmed the Fifth Circuit's precedent that universal vacatur is the appropriate remedy in immigration-related cases "because of the constitutional command for uniform immigration laws

and a concern that a geographically-limited injunction would be ineffective because [] beneficiaries would be free to move among states, *id.* at 187–88. No justification is given by Defendants for deviating from this precedent.

## CONCLUSION AND PRAYER

Plaintiffs request that the Court grant their Motion for Summary Judgment and enter a judgment vacating and holding unlawful the repeal of the 2019 Rule and the adoption of the 2022 Rule.

Dated: November 17, 2023.                    Respectfully submitted,

**KENNETH PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Deputy Attorney General for Civil Litigation

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**RYAN KERCHER**
Deputy Chief, Special Litigation Division

*/s/ JOHNATHAN STONE*
**JOHNATHAN STONE**
*Attorney-in-Charge*
Special Counsel
Texas State Bar No. 24071779
Southern District of Texas Bar No. 635446
Johnathan.Stone@oag.texas.gov

**CHARLES K. ELDRED**
Chief, Legal Strategy Division
Texas State Bar No. 00793681

Southern District of Texas Bar No. 20772
Charles.Eldred@oag.texas.gov

**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas State Bar No. 24105085
Southern District of Texas Bar No. 3369185
Ryan.Walters@oag.texas.gov

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4196
Facsimile: (512) 320-0667

*ATTORNEYS FOR TEXAS*

## Certificate of Service

I certify that on November 17, 2023, I filed this pleading through the Court's CM.ECF system, which served it on all counsel of record.

*/S/ JOHNATHAN STONE*
**JOHNATHAN STONE**
*Attorney-in-Charge*
Special Counsel

## Certificate of Word Count

I certify that this motion for summary judgment, according to the word-count function of Microsoft Word, on which this pleading was prepared, contains 7,910 words.

*/S/ JOHNATHAN STONE*
**JOHNATHAN STONE**
*Attorney-in-Charge*
Special Counsel