Case 6:23-cv-00001 Document 70 Filed on 09/30/24 in TXSD Page 1 of 15

United States District Court
Southern District of Texas
**ENTERED**
September 30, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 6:23-CV-00001 |
| | § | |
| SECRETARY ALEJANDRO MAYORKAS, SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UR MENDOZA JADDOU, DIRECTOR OF UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, IN HER OFFICIAL CAPACITY, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, AND JOSEPH R. BIDEN, JR. IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, | § § § § § § § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

For aliens[1] to be granted lawful entry into the United States, the Immigration and Nationality Act requires that it be unlikely that they will become a "public charge." Because the statute does not define this term, it has undergone administrative

---

[1] The Court understands that some may find the term "alien" offensive. The Court's intent is not to offend. Rather, the term is used in this opinion because it is used in the statutes and official government documents the Supreme Court quotes in a seminal immigration case. *See Arizona v. United States*, 567 U.S. 387, 397, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012). Moreover, "alien" and "immigrant" are different, defined statutory terms. *Compare* 8 U.S.C. § 1101(a)(3) *with id.* § 1101(a)(15).

interpretation since the late nineteenth century. This case concerns the definition of the term between 1999 and 2022.

In 1999, the Immigration and Naturalization Service, a predecessor agency to the Department of Homeland Security ("DHS") and the United States Citizenship and Immigration Services ("USCIS"), adopted administrative guidance defining a "public charge." Two decades later, in 2019, the Trump Administration's DHS issued a rule redefining the term (the "2019 Rule"). The 2019 Rule was challenged in several jurisdictions and was eventually vacated via court order. After the 2020 election, although appeals were pending, the Biden Administration announced that they would no longer defend the Trump-era Rule. Within a week of the announcement, DHS and USCIS implemented the vacatur repealing the 2019 Rule.

In September 2022, after a notice-and-comment period, the Biden administration promulgated a new Rule redefining the term. In response, the State of Texas brought this action under the Administrative Procedure Act, challenging the Biden administration's actions related to repealing the 2019 Rule and implementing the 2022 Rule. Texas has three claims. It alleges that adopting the 2022 Rule and repealing the 2019 Rule (1) exceeded statutory authority and was not in accordance with law, (2) was arbitrary and capricious, and (3) did not observe the procedure required by law.

But before the Court may consider the merits, Texas must prove that it has standing to bring this case. It has not done so here. Therefore, the Court does not reach the merits and offers no opinion about the legality of the Federal Government's actions regarding the 2019 and 2022 Rules.

Pending before the Court is Plaintiff's Motion for Summary Judgment filed by the State of Texas, (Dkt. No. 40), and Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment,[2] (Dkt. No. 47). After consideration, Plaintiff's Motion for Summary Judgment, (Dkt. No. 40), is **DENIED** and Defendants' Cross-Motion for Summary Judgment, (Dkt. No. 47), is **GRANTED in part** and **DENIED in part** as moot.

**I.    BACKGROUND**

For over a century, American law has provided for the exclusion of aliens who are likely to become a "public charge." The term "public charge" first appeared in the 1882 Immigration Act. *See* Joseph Daval, *The Problem with Public Charge*, 130 Yale L.J. 998, 1008 (2021). Like most statutes of that age, the 1882 Immigration Act has been amended and recodified several times. Nevertheless, it has remained essentially unchanged throughout most of its history. *See id.* at 1008–22.

Today, the law is codified at 8 U.S.C. § 1182(a)(4)(A). It currently provides: "Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* This "public charge" mandate saw an overhaul in the 1990s through the enactment of both the

---

[2]    Defendants are: (1) President Joseph R. Biden, in his official capacity, (2) Alejandro Mayorkas, Secretary of the United States Department of Homeland Security, in his official capacity, (3) the United States Department of Homeland Security, (4) Ur Mendoza Jaddou, Director of United States Citizenship and Immigration Services, in her official capacity, and (5) the United States Citizenship and Immigration Services. (Dkt. No. 1 at 4).

3

Personal Responsibility and Work Opportunity Reconciliation Act (commonly known as the "Welfare Reform Act")[3] and Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA").[4] Through the Welfare Reform Act, Congress restricted aliens from receiving certain categories of benefits. *See, e.g.*, 8 U.S.C. §§ 1601, 1611, 1613, 1621, 1622, 1641. In 1999, the Immigration and Naturalization Service issued field guidance to advise officials on how to make the public charge determination in light of these changes. *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28689, 28689–91 (May 26, 1999) (the "1999 Guidance").

The 1999 Guidance was the operative rule until the Trump administration's DHS issued a new rule in 2019. *See* Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51114 (Oct. 10, 2018) (codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, 248); Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41292 (Aug. 14, 2019) (codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, 248). The 2019 Rule was challenged in several federal courts, all of which determined that it was likely unlawful and entered preliminary injunctions as to its implementation.[5] The Government appealed these cases, requesting stays of the

---

[3] Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 (1996) (codified as amended in scattered sections of 8 U.S.C. (2024)).

[4] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) (codified as amended in scattered sections of 8 U.S.C. (2024)).

[5] *See, e.g.*, *Make the Rd. N.Y. v. Cuccinelli*, 419 F.Supp.3d 647, 667–68 (S.D.N.Y. 2019), *aff'd as modified sub nom. New York v. DHS*, 969 F.3d 42 (2d Cir. 2020); *Cook Cnty. v. McAleenan*, 417 F.Supp.3d 1008, 1030–31 (N.D. Ill. 2019), *aff'd sub nom. Cook Cnty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020); *CASA de Md., Inc. v. Trump*, 414 F.Supp.3d 760, 785–88 (D. Md. 2019), *rev'd and remanded*, 971 F.3d 220 (4th Cir. 2020); *City & Cnty. of S.F. v. USCIS*, 408 F.Supp.3d 1057, 1129–30 (N.D. Cal. 2019), *aff'd sub nom. City & Cnty. of S.F. v. USCIS*, 981 F.3d 742 (9th Cir. 2020); *Washington v. DHS*, 408 F.Supp.3d 1191, 1224 (E.D. Wash. 2019), *aff'd in part, vacated in part sub nom. City & Cnty. of S.F. v. USCIS*, 981 F.3d 742 (9th Cir. 2020).

injunctions. The injunctions were eventually stayed,[6] and DHS began implementing the 2019 Rule in early 2020. *See New York v. DHS*, 969 F.3d 42, 58 (2d Cir. 2020). Later that year, the Seventh Circuit affirmed an injunction out of the Northern District of Illinois. *Cook Cnty. v. Wolf*, 962 F.3d 208, 214–15 (7th Cir. 2020). And in November 2020, the Northern District of Illinois entered a partial final judgment vacating the 2019 Rule. *Cook Cnty. v. Wolf*, 498 F.Supp.3d 999, 1011 (N.D. Ill. 2020).

In early 2021, the Biden Administration stopped defending the 2019 Rule and dismissed the appeals in those cases, including one before the Supreme Court. (*See* Dkt. No. 40 at 14); (Dkt. No. 47 at 16). DHS then published a rule removing the 2019 Rule from the Code of Federal Regulations. *See* Inadmissibility on Public Charge Grounds; Implementation of Vacatur, 86 Fed. Reg. 14221 (Mar. 15, 2021) (codified at 8 C.F.R. pts. 103, 106, 212, 213, 214, 245, 248). After a notice-and-comment period, DHS published a new rule in early 2022. *See* Public Charge Ground of Inadmissibility (the "2022 Rule"), 87 Fed. Reg. 55472 (Sept. 9, 2022) (codified at 8 C.F.R. pts. 103, 212, 213, 245).

Texas filed this suit in January 2023 under the Administrative Procedure Act ("APA"). (Dkt. No. 1). Texas challenges the 2019 Rule's repeal and the 2022 Rule's adoption, asserting that Defendants' actions (1) exceeded statutory authority and were

---

[6] The Fourth and Ninth Circuits granted stays of the preliminary injunctions entered in their jurisdictions. *See CASA de Md., Inc. v. Trump*, No. 19-2222, Dkt. No. 21 at 1 (4th Cir. Dec. 9, 2019); *City & Cnty. of S.F. v. USCIS*, 944 F.3d 773, 781 (9th Cir. 2019). The Second and Seventh Circuits declined to do so, but the Supreme Court subsequently granted the government's motions for stays of the preliminary injunctions entered in Illinois and New York. *See Wolf v. Cook Cnty.*, 140 S.Ct. 681, 206 L.Ed.2d 142 (2020); *DHS v. New York*, 140 S.Ct. 599, 206 L.Ed.2d 115 (2020).

not in accordance with law, (2) were arbitrary and capricious, and (3) did not observe the procedure required by law.  (*Id.* at 21–23).  Texas requests that the Court hold the 2022 Rule unlawful, declare Defendants' actions unlawful, and enjoin Defendants from enforcing the 2022 Rule.  (*Id.* at 23).  A few months after Texas filed suit, Defendants moved to dismiss this case for lack of jurisdiction on standing grounds.  (Dkt. No. 22).  The Court denied the motion without prejudice, finding that the question of standing was better resolved on cross-motions for summary judgment where evidence could be presented.  (Dkt. No. 39 at 1, 3–5).  The Parties have now filed those cross-motions.  (Dkt. Nos. 40, 47).  With briefing complete, the Court turns to their arguments.

## II.     LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the suit's outcome under governing law.  *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  And "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the record evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  "If the moving party fails to meet [its] initial burden, the

6

motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must "'go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553). "The nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'" *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)), *as revised* (July 14, 2017). If evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

In reviewing a motion for summary judgment, the district court views the evidence in the light most favorable to the nonmovant. *Carr*, 866 F.3d at 601. This means that courts must resolve factual controversies in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

## III.     DISCUSSION

The Parties offer several arguments pertaining both to Texas's standing as well as the merits of its case. The Court need not reach the merits because Texas has failed to establish standing.

The standing doctrine has been distilled down to three parts. A plaintiff must demonstrate (1) that he has suffered an "injury in fact" that is "'concrete and particularized'" as well as "'actual or imminent,'" (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) the injury is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39, 136 S.Ct. 1540, 1547–48, 194 L.Ed.2d 635 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)). "'The party invoking federal jurisdiction bears the burden of establishing' standing—and, at the summary judgment stage, such a party 'can no longer rest on . . . "mere allegations," but must "set forth" by affidavit or other evidence "specific facts."'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12, 133 S.Ct. 1138, 1148–49, 185 L.Ed.2d 264 (2013) (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2137). Because "the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 2769, 171 L.Ed.2d 737 (2008) (citing *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2137).

8

### A. INJURY IN FACT

To prove an injury in fact, Texas must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136 (internal citations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990)). In recent years, states challenging federal immigration policies have proven injury in fact by demonstrating (1) an *additional alien* presence in that state because of the challenged action, (2) which results in *additional costs* paid from the state's treasury.

States have used various methods to establish the first prong—demonstrating additional aliens because of the challenged action—because the nature of the increase differs from case to case and can be proven in multiple ways. *See, e.g., Texas v. United States* ("*DAPA*"), 809 F.3d 134, 155 (5th Cir. 2015) ("DAPA would enable at least 500,000 illegal aliens in Texas . . ."), *as revised*, (Nov. 25, 2015), *aff'd by equally divided court*, *United States v. Texas*, 579 U.S. 547, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016); *Texas v. United States* ("*DACA*"), 50 F.4th 498, 508–09, 518 (5th Cir. 2022) (stating that "about 1.5 million aliens were covered by the DACA Memorandum" and "no one disputes that some" of them are in Texas); *Texas v. Biden* ("*MPP I*"), 10 F.4th 538, 547 (5th Cir. 2021) (per curiam) ("MPP's termination has caused an increase in immigration into Texas . . . ."); *Texas v. Biden* ("*MPP II*"), 20 F.4th 928, 966 (5th Cir. 2021) ("The district court's most important finding was that MPP's termination has increased the number of aliens released on parole into the United States, including Texas."), *as revised* (Dec. 21, 2021), *rev'd and remanded on other grounds*,

597 U.S. 785, 142 S.Ct. 2528, 213 L.Ed.2d 956 (2022). Tellingly, in each case, the state established either an increase in aliens or that an increase would occur.

On the second prong—additional costs paid by the state due to an increase in the number of aliens—states have typically provided evidence of expenditures related to driver's license issuances, healthcare administration, education provision, and incarceration/detention. *See*, *e.g.*, *MPP II*, 20 F.4th at 968–69 (driver's licenses and healthcare); *DACA*, 50 F.4th at 517–18 (healthcare and education); *Gen. Land Office v. Biden* ("*GLO*"), 71 F.4th 264, 272 (5th Cir. 2023) (driver's licenses, healthcare, and education); *Texas v. United States* ("*Enforcement Priorities*"), 40 F.4th 205, 216–18 (5th Cir. 2022) (per curiam) (driver's licenses, healthcare, education, and incarceration), *rev'd on other grounds*, *United States v. Texas*, 599 U.S. 670, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023). These fiscal-harm theories remain Fifth Circuit precedent. *See GLO*, 71 F.4th at 272 n.11.

In this case, Texas argues that the 2022 Rule "reduces the number of aliens who will be found to be inadmissible public charges, [and] the predictable effect of the 2022 Rule will be an increase in the number of aliens present in Texas . . . ." (Dkt. No. 40 at 15–16). This resulting increase, Texas argues, will increase Texas's spending on driver's licenses, incarceration, education, and healthcare. (*Id.* at 15–19); (*see also* Dkt. No. 64 at 10–13).

But Texas's argument fails at step one, as Texas has failed to submit *evidence* that an increase in aliens has occurred or is "imminent" for Article III purposes. *See Texas v. DHS*, No. 6:23-CV-00007, 2024 WL 2888758, at *3 (S.D. Tex. May 28, 2024) (requiring evidence of increased rate of alien entry at time suit was filed); *Arizona v. Garland*, ___

10

F.Supp.3d ____, ____, 2024 WL 1645417, at *11 (W.D. La. April 16, 2024) ("when deciding whether a state has been injured for Article III standing purposes, courts review whether the number of aliens, and the associated costs attributable to them, increased relative to those same numbers prior to the implementation of the challenged program").

Instead of providing evidence of an increase, Texas jumps straight to step two, and only offers evidence of expenses *if* additional aliens enter the state.[7] Texas failed to provide any evidence as to whether an increase has occurred or is imminent. In its Reply, Texas attempts to remedy this by pointing to a chart of the total population of individuals who applied for a status adjustment between 2014 and 2021. (Dkt. No. 64 at 8–9). This reflects the time periods before and after Defendants proposed the 2019 Rule.

Table 8. Total Population that Applied for Adjustment of Status, FY 2014 to FY 2021.

| Fiscal Year | Total Population Applying for Adjustment of Status |
|---|---|
| 2014 | 637,138 |
| 2015 | 638,018 |
| 2016 | 711,431 |
| 2017 | 763,192 |
| 2018 | 704,407 |
| 2019 | 600,079 |
| 2020 | 577,920 |
| 2021 | 726,566 |
| Total (FY 2014 – FY 2018) | 3,454,186 |
| 5-year average (FY 2014 – FY 2018) | 690,837 |

Source: USCIS analysis of data provided by USCIS, Policy and Research Division (Jan. 10, 2022)

---

[7] (*See* Dkt. No. 40-1 at 4–7) (declaration of Sheri Gipson on Texas's driver's license costs expended on aliens with lawful status); (*id.* at 8–10) (declaration of Rebecca Waltz on Texas's incarceration costs expended on undocumented aliens); (*id.* at 11–12) (declaration of Michael Meyer on Texas's costs expended on educating unaccompanied alien children); (*id.* at 13–16) (declaration of Susan Bricker on Texas's healthcare costs expended on aliens from Cuba, Haiti, Nicaragua, and Venezuela).

(*Id.* at 9) (citing Public Charge Ground of Inadmissibility, 87 Fed. Reg. 55472, 55602 (Sept. 9, 2022) (codified at 8 C.F.R. pts. 103, 212, 213, 245)).  Texas contends that the decrease in applications occurred because the 2019 Rule was stricter than the 1999 Guidance.  In other words, Texas argues that aliens who would have been eligible for a status adjustment under the 1999 Guidance may have learned of the stricter 2019 Rule and chose not to apply, believing their applications would be denied.  (*See* Dkt. No. 64 at 8).

The Court is unpersuaded. First, this is speculative at best.  Texas provides no evidence that the 2019 Rule resulted in fewer status changes.  Rather, the evidence shows only the number of annual *applications* for status adjustment each year—not the total granted.

Second, only "a subset of these individuals (i.e., those who are not exempt from the public charge ground of inadmissibility) [would have undergone] review for determination of inadmissibility based on public charge grounds."  Public Charge Ground of Inadmissibility, 87 Fed. Reg. at 55602.  In other words, this data set includes an unspecified number of individuals who are not subject to a public charge determination. Since individuals who are not subject to public charge determinations can seek a change in status, an increase in the number of applications for status adjustment after the 2019 Rule vacatur—assuming those applications were granted—does not necessarily mean that the number of applicants subject to a public charge determination increased or will likely increase.

Beyond the 2019 Rule vacatur, this data does not reflect the impact of the 2022 Rule change.  In fact, the data Texas relies on covers the period before and after the 2019 Rule,

but it does not cover the period relevant to the 2022 Rule. Thus, Texas provided no evidence that the 2022 Rule would increase immigration.

In sum, Texas has not provided evidence that a single *additional* person was, or would be, granted admission into the country, much less Texas, under the 2022 Rule as compared to the 2019 Rule. Accordingly, Texas has failed to meet its burden of proving an injury in fact and thus lacks standing.

### B.   SPECIAL SOLICITUDE

Texas also argues that it has standing because it has special solicitude.[8] (Dkt. No. 40 at 29–31); (Dkt. No. 64 at 3–4). "Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *DACA*, 50 F.4th at 514. "When special solicitude is appropriate, a state can establish standing 'without meeting all the normal standards for redressability and immediacy.'" *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 517–18, 127 S.Ct. 1438, 1453, 167 L.Ed.2d 248 (2007)). "Standing will

---

[8]   The Court recognizes that there is an ongoing discussion in the higher courts about whether the special solicitude doctrine remains viable. *United States v. Texas*, 599 U.S. 670, 688-89, 143 S.Ct. 1964, 1977, 216 L.Ed.2d 624 (2023) (Gorsuch, J., concurring) (explaining that "it's hard not to wonder why the Court says nothing about 'special solicitude' in this case. And it's hard not to think, too, that lower courts should just leave that idea on the shelf in future ones."). But the Supreme Court did not declare as much, and the Fifth Circuit has yet to tinker with special solicitude as it noted recently:

> We will merely make the related and additional point, perhaps for the benefit of a future panel or en banc court, that the "special solicitude" once afforded to states under *Massachusetts v. EPA*, . . . with respect to justiciability doctrines like standing, seems to also be falling out of favor with the Supreme Court.

*Netflix, Inc. v. Babin*, 88 F.4th 1080, 1089 n.12 (5th Cir. 2023). Therefore, the Court will engage in the special solicitude analysis until it receives orders to the contrary.

exist 'if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Id.* (quoting *Massachusetts*, 549 U.S. at 518, 127 S.Ct. at 1453).

In this case, Texas alleges a "quasi-sovereign interest in public charge determinations." (Dkt. No. 40 at 30). Specifically, Texas alleges that "Defendants' repeal of the 2019 Rule and adoption of the 2022 Rule greatly increases the class of people whom Texas law entitles to public services and benefits, which in turn pressures Texas to change its laws, thereby affecting a quasi-sovereign interest." (*Id.*).

These allegations are insufficient. As the Fifth Circuit has explained, special solicitude is "not a standing shortcut when standing is otherwise lacking" because a state must still substantiate a cognizable injury that is both concrete and particularized. *La. State ex rel. La. Dep't of Wildlife & Fisheries v. NOAA*, 70 F.4th 872, 882 (5th Cir. 2023). As explained above, Texas has not shown that the 2022 Rule caused an increased alien presence in Texas and, as a result, has not established an injury. *See supra* Section III.A. Texas, therefore, lacks standing based on special solicitude.

## IV. CONCLUSION

The burden to establish standing is always on the plaintiff, and Texas has failed to meet its burden here. Plaintiff's Motion for Summary Judgment, (Dkt. No. 40), is **DENIED**, and Defendants' Cross-Motion for Summary Judgment, (Dkt. No. 47), is **GRANTED in part** insofar as it is premised on Texas's lack of standing and **DENIED in part** as moot as to all other parts addressing the merits.

It is SO ORDERED.

Signed on September 30, 2024.

                                                                           _____
                                                                                   **DREW B. TIPTON**
                                                             **UNITED STATES DISTRICT JUDGE**